OPINION OF THE COURT BY JUSTICE KELLER
A Jefferson County jury convicted Cleosey Darnell Henderson, II of Assault, first degree, Sexual Abuse, first degree, and Unlawful Imprisonment, first degree. The jury also found Henderson was a persistent felony offender (PFO) in the first-degree. He was sentenced, per the jury's recommendation, to a total sentence of sixty years. Henderson now appeals his conviction and sentence as a matter of right on several grounds. For the following reasons, we affirm his conviction.
I. BACKGROUND
Alice,[1] Henderson's neighbor, walked over to his home to request money that she alleged Henderson owed her. After answering the door and engaging in some conversation, Henderson grabbed Alice by the throat and attacked her. She lost consciousness and, at some point, awoke, tied up in Henderson's bedroom. Alice lost consciousness multiple times throughout the encounter but testified that Henderson had removed her pants and panties and digitally penetrated her vagina. Henderson cut Alice multiple times with a sharp object that Alice could not specifically identify in her testimony. Alice was ultimately able to free herself and leave through a window, during which her legs were cut from the broken glass. She escaped to a neighbor's home where she obtained help and was taken to the hospital for treatment. She had multiple cuts and bruises from the assault.
Henderson was arrested in November of 2011, yet his trial did not occur until June of 2016. For this reason, on appeal, he argues that his constitutional right to a speedy trial, under both the United States Constitution[2] and the Kentucky Constitution,[3] was violated and he is entitled to a dismissal with prejudice. Henderson also alleges prejudicial error in: (1) the trial *658 court's failure to appoint substitute counsel; (2) the trial court's failure to advise Henderson of his right to stand-by or hybrid counsel; (3) the trial court's denial of Henderson's motion to suppress; (4) the exclusion of evidence under the Rape Shield Law; and (5) the trial court's inaccurate curtailing of Henderson's right to recall a witness. For the following reasons, we find no reversible error and affirm the judgment of the Jefferson Circuit Court.
A timeline of this case is integral to the speedy trial analysis. As such, the Court must, in detail, describe exactly what occurred during Henderson's case and the dilatory nature of any delay.
Timeline
Henderson was indicted on December 28, 2011 and arraigned in January of 2012. His jury trial was scheduled at that time for July 17, 2012. His first appointed public defender was present with him at a bond reduction hearing on January 27, 2012, but he had to be appointed a new attorney when his original counsel left the DPA. The newly-appointed attorney appeared with him at his next pretrial conference on April 23, 2012. It seemed that it was this court's practice, from the record and from counsel's statements at appearances, to schedule fewer pretrial conferences until trial. Thus, from Henderson's court record, it was not unusual, absent motions or issues, for two to four months to pass between appearances in the circuit court. While that delay is not necessarily excusable, the description of local practice[4] is important to understanding the context of Henderson's case.
The first suppression motion was filed on May 30, 2012 and set for hearing on June 22, 2012. Rather than utilizing that date for the hearing, defense counsel, with agreement from the Commonwealth, moved to remand the jury trial date and utilize that date as the suppression hearing. The reason is unclear from the record, but that date was also rescheduled, and the suppression hearing was held on September 11, 2012. The parties set the jury trial for May 7, 2013. The context of the May date is also important; the dissent focuses on the length of time between trial dates and the inevitable delay to Henderson's case. While attempting to reschedule dates, the trial court, prosecutor, and defense attorney all had burdensome schedules with which to arrange possible dates for Henderson's trial. Both the prosecutor and defense attorney were working on other murder cases and there was at least one reference to a capital case. The trial court also had a cumbersome schedule with multiple civil jury trials; each time the parties had to reschedule, the judge contacted his assistant on speaker phone to tell him the next possible date. This May 7, 2013 date was the first time that all the parties were available for another trial. Although this is a long period, this context must be appreciated and understood. The parties were not being intentionally dilatory but were, instead, attempting to cooperate with three diverse and busy schedules to accommodate Henderson's need for access to the court.
Henderson's attorney filed some uncomplicated motions over the next few months, including a second suppression motion. After that motion was filed, the parties attempted to schedule a second hearing. The lead detective for the Commonwealth was unavailable until the trial date as she was on medical leave. The dissenting opinion states that the Commonwealth was unable to proceed to hearing on February 11, 2013 after the filed motion. However, from review of the record, February 11 was a pretrial conference at which time the parties *659 were to schedule a hearing because of Henderson's recently filed motion (filed on February 5, 2013). The Commonwealth was ready to proceed with the jury trial date in May; it simply was unable to produce its witness before that time. The parties agreed to convert the trial date to a suppression hearing and reschedule the trial. Thus, the prosecution, from this review of the record, never requested a continuance for its preparation but merely consented to defense requests for such.
On March 4, 2013, Henderson filed a demand for a speedy trial. In May, although the reasons are unclear from the record, the suppression hearing was rescheduled for June 26, 2013 and a jury trial date was scheduled for October 28, 2013. The suppression hearing occurred on the June 26 date. In October, and for reasons that are once again unclear from the record, the court entered an order rescheduling the jury trial for June 3, 2014.
On November 11, 2013, Henderson filed a pro se motion to dismiss for violating his right to a speedy trial. The hearing, from pleadings, was rescheduled by the trial court twice. It finally occurred on May 7, 2014. By that time, Henderson had filed a second pro se motion for an expert witness. At the May 7 hearing, Henderson first stated that he would like to dismiss his attorney and have a new lawyer appointed. The judge asked him to file that in writing so that the court could address it later but specifically pointed out to Henderson that such a motion would definitely delay the trial even longer, in spite of his request for a speedy trial. Henderson stated that the request was necessary and "it would just have to happen." Based on these motions requiring an ex parte hearing, the court scheduled those motions to be heard on May 12, 2014.
On May 12, Henderson filed his pro se motion for conflict counsel and the hearing went forward. Henderson there stated that he "refuse[d]" to go to trial with his appointed attorney. The circuit court converted the June trial date to a pretrial conference and stated it would have all rulings on pending motions ready and the parties would move forward accordingly. On June 3, the circuit court again stated that the drafts on rulings were complete but he needed to pass thirty days to finish. The next appearance was scheduled for July 2 but, for reasons unknown from the record, the next appearance was on August 8, 2014. At that time, the judge tendered orders denying both motions to suppress, the motion for conflict counsel, and the motion for expert witness. He stated that he still needed to issue a ruling on the motion to dismiss (the subsequent order denying was entered September 16, 2014). The next pretrial was set for October 2, 2014. The parties began scheduling a new trial but Henderson interrupted and requested that they wait to reschedule the jury trial until the next pretrial conference.
On September 30, Henderson filed a pro se motion to dismiss and another pro se motion to dismiss was filed on October 2, 2014. There was a pretrial conference on October 2, as scheduled, and a new jury trial was scheduled for June 23, 2015. At that appearance, Henderson stated again that he would not go to trial with his appointed attorney. Henderson filed a pro se motion to reconsider suppression on October 12, 2014. The parties appeared in court on November 14, at which time defense counsel requested that the parties have more "face to face" time with the court. The next status was scheduled for January 16, 2015. The jury trial remained scheduled for June 23, 2015. The court entered an order denying the motion to dismiss on December 22, 2014.
*660 On January 16, 2015, the parties appeared for a status. Both attorneys stated there were no issues to address. Henderson interrupted and stated that God had told him to inform the court that he would no longer need an attorney. He reiterated that he wanted to dismiss his appointed counsel and that "the Lord will fight my cause" and "the Lord will be my defense." The court did not question much further at that time but requested that Henderson place his motion in writing for the court to address. On February 6, 2015, he filed a pro se motion to reconsider, accusing the Commonwealth of lying in a previous reply memorandum. Henderson filed his pro se motion to dismiss counsel on February 11 and sent an additional pro se letter to the court on February 23. In his motion to dismiss counsel, Henderson stated "the Lord is now the defendant's defense."
The trial court conducted a hearing on the motion to dismiss appointed counsel on April 7, 2015. At that time, the judge questioned Henderson further on exactly what he meant by the Lord being his defense. He asked him practical questions like who would be questioning the witnesses, who would be at bench conferences, etc. His appointed attorney attempted to clarify further, asking him whether the questions would be coming out of Henderson's mouth or not. Henderson refused to answer, stating that his attorney was mocking him. He was unable to answer these practical questions, merely saying that "the Lord will be my defense" and that he had "no need for court appointed counsel." He also stated that God had been "revealing things" to him throughout this entire process and God told him that he did not need a lawyer. The court said it would issue a decision on the motions.
On June 1, 2015, the parties appeared again and addressed a motion in limine from the Commonwealth. At that time, Henderson once again interrupted. This time, he objected to the detective being present at the Commonwealth's table, at that appearance and at trial. He said she should not be present at all and repeatedly insisted that she was "not in my discovery motion." On June 2, 2015, the trial court entered an order for a competency evaluation upon its own motion, as well as an order denying the motion to dismiss. Upon the competency order, Henderson was admitted to Kentucky Correctional Psychiatric Center ("KCPC") on July 6, 2015 and evaluated.
The parties appeared in court again on August 3, 2015 and scheduled a competency hearing for September 22, 2015. Defense counsel was instructed to check with the KCPC evaluator for availability; on August 15, an order was entered rescheduling the hearing for October 15, 2015, presumably due to a scheduling conflict (however, this is not clear from the record). Henderson proceeded to file more pro se motions: open record requests to the clerk for victim history and case history (filed September 8, 2015); a federal lawsuit against his attorney and the public defender's office (filed September 10, 2015); a letter to the court informing it of the federal suit (filed October 7, 2015); and another demand for speedy trial (filed October 15, 2015).
The competency hearing was held on October 15; the trial court said it would issue a ruling and Henderson stated that he had filed another pro se motion for conflict counsel based on the newly-filed federal lawsuit. On October 27, the court entered orders finding Henderson competent; denying conflict counsel; and denying the motion to reconsider. The next appearance was November 3, 2015. At that time, the attorneys agreed that, given the status of all orders, it was necessary to set a jury *661 trial date. A jury trial was scheduled for June 6, 2016 and a final pretrial conference was set for May 20, 2016. At this time, Henderson also belligerently addressed the trial court, asking "are you even reading these motions for real?" Upon response, Henderson also responded angrily that he would get his case "reversed" and everyone would "be right back here." The court ended the pretrial conference.
On February 26, 2016, Henderson filed a pro se motion to represent himself and, on March 4, 2016, filed a pro se motion to change conditions of release. The court heard parties on the motion to waive counsel on March 28, 2016, and the court conducted a Faretta inquiry.[5] The trial court offered Henderson the option of having his appointed counsel assist in subpoenas, clothing, and other practical matters for trial. At first, both Henderson and his attorney agreed to such a situation. But, then Henderson again stated that he wouldn't be needing an attorney, "God is [his] defense ... [and he'd] be just fine." When asked whether such a decision was in his best interest, Henderson responded, "If I'm gonna go down, gonna go down fighting for myself. So yes, it's in my best interest." The court entered an order the same day allowing Henderson to represent himself.
On April 7, 2016, Henderson filed a pro se petition for a writ of prohibition, prohibiting any further prosecution. On April 12, he also filed a response to the Commonwealth's motion in limine. On May 20, 2016, the parties appeared for the final pretrial conference before trial on June 6. At that time, Henderson specifically requested that the jury trial be continued until the Court of Appeals had made a decision on his petition for writ. The court said it would proceed as though it was going to trial and pass the decision until that time. Henderson objected for the record to going forward. The trial did occur on June 6 and defendant was convicted by the jury of assault, first degree; sexual abuse, first degree; unlawful imprisonment, first degree; and persistent felony offender, first degree. The jury recommended an enhanced sentence of sixty years. Henderson was formally sentenced on August 5, 2016.
II. ANALYSIS
A. Right to Speedy Trial
This Court analyzes alleged violations of the right to speedy trial under the four-factor Barker test. Dunaway v. Commonwealth, 60 S.W.3d 563, 569 (Ky. 2001) (citing Barker v. Wingo, 407 U.S. 514, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972) ). The four factors under this test are: "(1) the length of delay, (2) the reason for the delay, (3) the defendant's assertion of his right, and (4) the prejudice to the defendant caused by the delay." Dunaway, 60 S.W.3d at 569. "No single one of these factors is determinative by itself." Id. (quoting Gabow v. Commonwealth, 34 S.W.3d 63, 70 (Ky. 2000) ). "We regard none of the four factors ... as either a necessary or sufficient condition to the finding of a deprivation of the right of speedy trial. Rather, they are related factors and must be considered together with such other circumstances as may be relevant." Stacy v. Commonwealth, 396 S.W.3d 787, 795 (Ky. 2013) (quoting Barker, 407 U.S. at 533, 92 S.Ct. 2182 ).
1. Length of Delay
The fifty-six-month delay in this case is clearly presumptively prejudicial. Under our precedent, that presumptive nature is clear. The dissent characterizes *662 Henderson's case as not "complex." However, this case presented a wealth of physical evidence, as well as DNA evidence. It was a violent crime with a victim testifying to difficult facts. Given our precedent, we do not characterize this case as "simple." See Stacy, 396 S.W.3d at 796 (finding an arson and riot case "serious and of moderate complexity"). Henderson presented a completely contradictory narrative, thus lending far more importance to the physical and scientific evidence for the jury. As such, this case cannot be labeled "simple and straightforward." However, this does not change the fact that a fifty-six-month delay is presumptively prejudicial.
2. Reason for Delay
There are "three categories of reasons for delay: (1) a 'deliberate attempt to delay the trial in order to hamper the defense'; (2) a 'more neutral reason such as negligence or overcrowded courts'; and (3) 'a valid reason, such as a missing witness.' " Dunaway, 60 S.W.3d at 570 (quoting Barker, 407 U.S. at 531, 92 S.Ct. 2182 ). These "different reasons should be allocated different weights[.]" Dunaway, 60 S.W.3d at 570 (citing Barker, 407 U.S. at 531, 92 S.Ct. 2182 ).
A deliberate attempt to delay the trial in order to hamper the defense should be weighted heavily against the government. A more neutral reason such as negligence or overcrowded courts should be weighted less heavily but nevertheless should be considered since the ultimate responsibility for such circumstances must rest with the government rather than the defendant. Finally, a valid reason, such as a missing witness, should serve to justify appropriate delay.
Stacy, 396 S.W.3d at 796 (quoting Miller v. Commonwealth, 283 S.W.3d 690, 700 (Ky. 2009) ). Looking at the timeline of this case, there are three major reasons for delay: (1) the trial court's tardiness in responding to Henderson's motions to suppress; (2) Henderson's insistence upon filing numerous and repetitive pro se motions, while still being represented by appointed counsel; and (3) Henderson's continuous demands for a new appointed attorney.
In Stacy, this Court pointed to the defendant's "abundance of pro se motions." Stacy, 396 S.W.3d at 797 (emphasis added). "While simultaneously pursuing his motion for a speedy trial, Appellant filed two subsequent motions requesting additional discovery, a motion for access to the crime scene, and a motion for a Faretta hearing." Id. (citation omitted). Recognizing that a defendant has a right to file such motions, the Court still recognized that "the trial court must have sufficient time to dispose of them before trial." Id. Here, Henderson continued to insist upon a speedy trial yet also filed multiple pro se motions, often in duplicate or triplicate. Many motions were based upon the exact same grounds and offered nothing new for the trial court except to issue another written order.
Much of the delay throughout Henderson's case stemmed from his consistent, yet often unfounded, insistence upon new appointed counsel. As Justice Hughes noted in Goben v. Commonwealth, "[t]he speedy trial clause does not guarantee continuous or effective representation or prompt discovery. To the extent that Goben's rights to those things were violated, he may have other recourse, but the alleged violations were not the result of trial delay and so do not add any weight to Goben's speedy trial claim." 503 S.W.3d 890, 910 (Ky. 2016). In Goben, much of the delay was caused by conflicts and motions to withdraw based on conflicts involving multiple co-defendants. See id. at 909.
*663 Here, the delay was even more unquestionably attributable to Henderson: despite an attorney that seemed to take multiple steps to protect Henderson's rights (filing suppression motions, speaking to experts on his behalf without being charged by those experts, negotiating offers with the Commonwealth, ensuring Henderson would appear more often in front of the trial court, and even continuing to advocate for the positions Henderson sought despite Henderson's continued efforts to "dismiss" him), Henderson continued to attempt to force the trial court's hand in retaining new counsel for him. It appears, from the record, highly doubtful that substitute counsel would have been able to take any further steps on Henderson's behalf or satisfy Henderson with his or her defense.
We must also note that there are three separate entities we must consider for reasons of delay: the trial court, the prosecution, and then the defendant. Here, while there were delays due to the trial court, there were no requests for continuance by the prosecution. This fact must also be considered in the weighing of the Barker factors. In McDonald v. Commonwealth, the Court stated that "it is apparent the Commonwealth was making a good-faith effort to bring McDonald to trial. Here McDonald did not object to any of the continuances. The record is vague as to the reasons for many of the continuances ..." 569 S.W.2d 134, 137 (Ky. 1978). The Court found that McDonald did not argue any of the specific continuances were inappropriate and thus he "participated in the delay." Id. Likewise, it seems that the prosecution here persisted in a good-faith effort to bring Henderson to trial. Henderson did not raise any objections to continuances of the trial date at any point during the proceedings. He complained of delays in his demands for speedy trial and motions to dismiss for violations of such, yet did not raise objections when the trial court continued his trial. Additionally, shortly before the June 2016 trial date, Henderson himself asked for a continuance.[6] He wanted to cease any activity in the case until the Court of Appeals had issued a response on his petition for writ of prohibition. This shows a complicity in the delay, or an effort to utilize such delay to his advantage. At the very least, it shows that his insistence upon a speedy trial was less than genuine.
The dissent states that a "whole year of delay was caused by the trial court's unjustifiable decision to compel [Henderson] to submit to a competency evaluation." The Court cannot agree with this assessment. We cannot, from this record, state that the court's decision was "unjustifiable." Kentucky Revised Statute (KRS) 504.100 states that if the court, at any point, "has reasonable grounds to believe the defendant is incompetent to stand trial, the court shall appoint" a professional to evaluate the defendant's condition. KRS 504.100(1) (emphasis added). This is a mandatory duty if the court has reasonable grounds to even question a defendant's competence. While the dissent is willing to make the leap that, given the entire context of this case, the trial court's doubts were entirely unfounded, a majority of this Court must disagree with such a conclusion.
"It is within the trial court's discretion to determine whether there are *664 'reasonable grounds' to believe a defendant may be incompetent to stand trial." Slone v. Commonwealth, 382 S.W.3d 851, 859 (Ky. 2012) (quoting Bishop v. Caudill, 118 S.W.3d 159, 161 (Ky. 2003) ). "However, once facts known to the trial court are sufficient to place a defendant's competency at issue, an evaluation and evidentiary hearing are mandatory." Slone, 382 S.W.3d at 859 (quoting Bishop, 118 S.W.3d at 161 ; citing Gray v. Commonwealth, 233 S.W.3d 715, 718 (Ky. 2007) ). Aside from this statutory right, "the United States Constitution, as a matter of due process, bars trying a defendant who is incompetent to stand trial." Woolfolk v. Commonwealth, 339 S.W.3d 411, 421 (Ky. 2011) (citing Drope v. Missouri, 420 U.S. 162, 95 S.Ct. 896, 43 L.Ed.2d 103 (1975) ). " 'Evidence of a defendant's irrational behavior, his demeanor in court, and any prior medical opinion on competence to stand trial are all relevant facts for a court to consider' in reaching its decision." Woolfolk, 339 S.W.3d at 422 (quoting Mills v. Commonwealth, 996 S.W.2d 473, 486 (Ky. 1999) ). This Court has recognized a trial court's superior position "to observe [a defendant's] conduct and demeanor ... and to evaluate the circumstances ..." Woolfolk, 339 S.W.3d at 423.
The statute and corresponding precedent create a significant responsibility for a trial court; upon seeing what it deems, within its discretion, as reasonable grounds to question competency, that court must order an evaluation. The dissent looks to the evaluation and post-trial circumstances to determine that the trial court was unfounded in what it deemed "reasonable grounds" to question competency. Yet, this is improper. We must look at what was before the trial court at the time it ordered an evaluation: Henderson had begun speaking in hyper-religious speech. He was not just speaking of a strong faith, a character trait which should not lead to competency questions. He was speaking of an audible voice instructing him as to his defense. Henderson, arguably, was acting contrary to his interests to accommodate the instructions of the "voice" he heard. He also stated that the voice had been "revealing" things to him the entire time. This language is, in itself, troubling enough. However, the trial court also saw an increasing aggression in Henderson's conduct, looking to his accusations against the Commonwealth and the trial court. Additionally, he began making hostile objections at appearances, such as stating that the lead detective should not even be present at the Commonwealth's table at any time during his proceedings. Given all this information and looking at the seriousness of the charges and the constitutional imperative that Henderson be competent to face those charges, the court's order was not unreasonable. A "valid reason, such as a missing witness, should serve to justify appropriate delay." Stacy, 396 S.W.3d at 796 (quoting Miller v. Commonwealth, 283 S.W.3d 690, 700 (Ky. 2009) ). Ensuring a defendant's constitutional right to be competent is a "valid reason" and justifies reasonable delay connected to those proceedings.
Thus, looking at the three major causes of delay-the trial court's late orders on suppression; Henderson's pro se motions; and Henderson's insistence on new counsel-most of the delay was caused by Henderson himself. This Court does not excuse the trial court's failure to promptly respond to Henderson's suppression motions. This factor must weigh heavily against the government. However, the competency evaluation was legally necessary and a valid reason for delay. All other delay was caused by Henderson's own conduct.
3. Waiver and Assertion
An assertion of the right to speedy trial "must be viewed in light of *665 [defendant's] other conduct." Dunaway, 60 S.W.3d at 571 (quoting United State v. O'Dell, 247 F.3d 655, 671 (6th Cir. 2001) (quoting United States v. Loud Hawk, 474 U.S. 302, 314, 106 S.Ct. 648, 88 L.Ed.2d 640 (1986) ) ). "[I]f delay is attributed to the defendant, then his waiver may be given effect under standard waiver doctrine." McDonald, 569 S.W.2d at 137.
In Dunaway, the Court determined that "six months of frivolous petitions by the defendant reduced the sincerity of defendant's assertion of his right." 60 S.W.3d at 571. Although Dunaway referred to delays, he "never mention[ed] voicing a single objection." Id. "If a defendant acquiesces in a delay, he cannot be heard to complain about the delay." Id. (quoting Gabow, 34 S.W.3d at 70 ). Additionally, although a defendant may assert the right to a speedy trial, complicity in continuing dates may be inferred as acquiescing and not vigorously invoking the right to speedy trial. See Stacy, 396 S.W.3d at 798.
Here, Henderson continued to file pro se motions, all while insisting upon a speedy trial. He continued to demand a new attorney, despite the court's advising him that such a request would inevitably cause further delay. He never once objected to one of the continuances during a court appearance. He even requested another continuance before his June 2016 trial date, making sure his objection to the trial going forward was preserved for the record. Henderson did, both in writing and verbally, assert his constitutional right to a speedy trial. Yet aside from those steps, all his actions seem intent upon causing delay and utilizing that delay to his defense's advantage. Thus, Henderson's invocation was less than "vigorous."
4. Prejudice
There are three interests protected by the right to a speedy trial: "(1) to prevent oppressive pretrial incarceration; (2) to minimize anxiety and concern of the accused; and (3) to limit the possibility that the defense will be impaired." Dunaway, 60 S.W.3d at 571-72 (quoting Barker, 407 U.S. at 532, 92 S.Ct. 2182 ). The last consideration "is the most serious." Dunaway, 60 S.W.3d at 572 (citing Barker, 407 U.S. at 532, 92 S.Ct. 2182 ).
To a certain extent, the dissent's determination that Henderson suffered prejudice through oppressive pretrial incarceration is correct. Yet this is only one factor for the prejudice analysis under Barker. Henderson has not presented any proof of anxiety beyond that which accompanies an ordinary prosecution. See Dunaway, 60 S.W.3d at 572. He has also not presented a showing of any concrete prejudice to his defense. Contrary to Henderson's claim of prejudice to his case, the delay actually assisted his defense in a very concrete way. Alice, the victim in this case, was a convicted felon at the time of trial. She was not a convicted felon when the assault occurred. She admitted that, after this happened, she began using drugs again and "caught [her] first felony" after this incident. This lends a certain weight to Henderson's defense, claiming that Alice was less credible and had used drugs leading to her allegations against him. Given this context, the Court must look at all these factors and determine how the delay balances, whether it be against the defendant or the government.
5. Weighing the Factors
Although, as the dissent states, "deprivation of liberty is the core value the Speedy Trial Clause was designed to protect," the analysis of prejudice and the weight given to all the factors here leads to a conclusion that Henderson's constitutional rights were not violated. Henderson was subjected to a lengthy pretrial detention *666 before reaching a jury trial. Such pretrial detention is a problem our courts are continually addressing through pretrial monitoring programs, reform of rules and regulations regarding bond and bail, and expansion of monitoring programs while awaiting trial. However, Henderson's pretrial detention, while extremely significant, was not sufficient, while weighing and examining all the Barker factors, to find a constitutional violation.
Henderson continued to exacerbate the delay of his case through repetitive motions, argumentative attitude, and an unwillingness to comply with procedural protections. He was intent on having his way, from his choice of appointed counsel to exactly how the case should proceed; yet, despite all the parties' attempts to accommodate his requests, he insisted the process was taking too long. The trial court was remiss in its duties here, most notably through the two-year delay in tendering an order on Henderson's motions to suppress. However, the trial court's attempts to progress Henderson's case were consistently hindered by Henderson's own machinations. Although the trial court was tardy here, this Court cannot hold that the entire reason for delay was on the government and therefore entitles Henderson to a dismissal of his case.
In Doggett, the United States Supreme Court noted that "if the Government had pursued Doggett with reasonable diligence from his indictment to his arrest, his speedy trial claim would fail. Indeed, that conclusion would generally follow as a matter of course however great the delay, so long as Doggett could not show specific prejudice to his defense." Doggett v. United States, 505 U.S. 647, 656, 112 S.Ct. 2686, 120 L.Ed.2d 520 (1992). In Doggett, the Court there noted a complete absence of any effort on the government's part to prosecute Doggett for over six years. Id. at 652-53, 112 S.Ct. 2686. "The Government, indeed, can hardly complain too loudly, for persistent neglect in concluding a criminal prosecution indicates an uncommonly feeble interest in bringing an accused to justice; the more weight the Government attaches to securing a conviction, the harder it will try to get it." Id. at 657, 112 S.Ct. 2686. Here, the government was not completely inactive like in Doggett. The Commonwealth's Attorney's office was consistently taking steps to further the prosecution and navigate a clogged trial schedule to ensure Henderson was brought to justice.
The language of McDonald is compelling here: "the delay here was extraordinary and presumptively prejudicial; however, in balancing the factors ... we are of the further opinion the prosecution exercised good faith in attempting to bring McDonald to trial, the delays were not shown to be for other than valid reasons and a significant portion of the delays is attributed to McDonald." McDonald, 569 S.W.2d at 137. There, the Court determined that rather than honestly and vigorously asserting the right to a speedy trial, McDonald "hoped to take advantage of the delay in order to obtain a dismissal of the charge, and ... the prejudice to McDonald by reason of the delay was minimal if any prejudice resulted at all." Id. Henderson's conduct is similar. While his words demanded a speedy trial, his conduct hindered such progress.
The dissent has occluded the weighing of the Barker factors by focusing solely on the problem of liberty. The liberty interest is a vitally important one to protect. However, this Court cannot set aside all the other factors and case precedent to determine that Henderson's deprivation of liberty here was sufficient prejudice, on its own, to warrant dismissal of his entire case. Here, the balance of all the factors *667 and circumstances weighs against Henderson. His consistent actions to delay proceedings, countered by the prosecution and trial court (absent the delay in assessing the suppression motions) attempting to push the case forward, show a certain lack of sincerity in insisting upon a speedy trial. For all these reasons, Henderson's right to a speedy trial was not violated.
Henderson also alleged the trial court erred in: (1) failing to appoint him substitute counsel; (2) failing to advise him of the right to or appoint stand-by or hybrid counsel; (3) denying his motion to suppress; (4) excluding evidence under the Rape Shield Law; and (5) misadvising him of his right to recall a witness, thereby interfering with his right to present a defense.
B. Substitute Counsel
Henderson alleges that the trial court abused its discretion in refusing to grant him substitute counsel, as he repeatedly requested. Henderson filed his first pro se motion for conflict counsel on May 12, 2014, after the trial judge asked him to put his request in writing. That same day, the court held an ex parte hearing to determine whether defense counsel should be removed.
At the hearing, Henderson cited to a complete breakdown in communication and a disagreement with appointed counsel as to his defense to proffer at trial. As to his defense, he argued (1) he was not guilty; (2) the injuries to the victim could have been caused by breaking glass from her going through his window, rather than a knife; (3) the victim's actions could have been caused by her consumption of illicit substances; and (4) that the indictment violated the proscription against double jeopardy by charging him with both attempted murder and assault, first degree. The trial court inquired into the alleged breakdown and defense strategy. Henderson argued that the victim climbed out of a broken window after a consensual sexual encounter; when she was outside and screaming, he ran because he was scared of the reaction of bystanders. Henderson argued there had been no discussions as to trial strategy and his counsel insisted he would "go by the evidence." Henderson did concede that his attorney had forwarded all the discovery to him, other than what he claimed was a missing page (page 18) in the discovery packet.
The trial court asked Henderson what conflict counsel could do that his current attorney had refused to do. In response, Henderson stated: "My spirit just don't bear witness with Mr. Lemke no more." Henderson admitted that his attorney had met with him at least eight to nine times, asking him questions about discovery. But Henderson decided that the relationship "just won't work." He wanted an attorney who would put forth "some kind of effort" for his defense. Henderson described conversations with his attorney that sound like an attorney explaining certain legal rules on evidence admissibility and limitations. He stated that he and his attorney had discussed the option of testifying at trial but that he hoped the parties would be able to come to some kind of agreement before trial.
Appointed counsel adamantly argued he was doing all he could to provide effective counsel for Henderson. He stated that he and Henderson had met on multiple occasions and discussed strategy. Many of the statements Henderson cited were, as Lemke argued, parts of conversations about what could or may happen at trial. He explained some of the admission or evidentiary issues that may arise at trial, as reference by some of Henderson's remarks. Lemke described their conversation on testifying, explaining how some *668 statements that may otherwise be inadmissible could be utilized as impeachment evidence if he did testify. He admitted to saying that he would "go by the evidence," because he had stated he could not prove Henderson's argument as to victim's impairment because he had no evidence she was under the influence at the time of the alleged assault. As to the expert witness issue, Henderson wanted to hire a glass and cut specialist (amongst other various experts) in reference to the victim's cuts and injuries. Lemke informed the court that he had contacted a specialist in cuts, who evaluated the evidence for him for free. Lemke stated that, after receiving that opinion, he was not going to call the expert as a witness or contact any further experts on that particular issue. As to the double jeopardy issue, Lemke informed the court he did not believe there was a mechanism to remove one of the charges before trial but had case law as to objecting to instruction on one of the charges at the close of evidence.
Lemke stated that the Commonwealth had made an offer of 25 years and that he believed that offer was still available. However, Henderson interrupted, stating he was unwilling to take any offer more than 3 years. Lemke stated he felt he had done nothing improper and had done everything that competent counsel would do under the circumstances; he added that he would object to being removed. Henderson, as an additional point, stated that many of his friends had been represented by Lemke and had not had good outcomes and felt this was not a good "track record" for an attorney to represent him and simply stated "he's not for me." The trial court entered a final order denying Henderson's motion on August 8, 2014.
At an appearance on October 2, 2014, Henderson reiterated that he wanted new counsel and stated that he was "not going to trial" with this attorney. On January 16, 2015, the parties appeared for another update. Attorneys stated there were no pending issues, but Henderson interrupted, stating that he no longer needed an attorney and that God would be representing him. Henderson followed up this statement with a pro se motion to dismiss his public defender and a letter to the court. On April 7, 2015, the court held another hearing. Henderson's conduct led to the court's order requiring a competency evaluation in June 2015.
On September 10, 2015, Henderson sent a letter to the court, informing it that he had filed a pro se federal lawsuit against his public defenders and the Department of Public Advocacy. He again requested conflict counsel. The court entered another order on October 27, 2015 denying the request for substitute counsel. On February 26, 2016, Henderson then filed a motion to represent himself. After a hearing on March 28, 2016, the trial court entered an order allowing the defendant to forego counsel and represent himself at trial.
"[A] defendant who is represented by a public defender or appointed counsel does not have a constitutional right to be represented by any particular attorney, and is not entitled to the dismissal of his counsel and the appointment of substitute counsel except for adequate reasons or a clear abuse by counsel." Henderson v. Commonwealth, 636 S.W.2d 648, 651 (Ky. 1982) (citations omitted). "When an indigent defendant seeks to change his appointed counsel, he carries the burden of demonstrating to the court that there exists 'good cause, such as a conflict of interest, a complete breakdown of communication or an irreconcilable conflict." ' Stinnett v. Commonwealth, 364 S.W.3d 70, 81 (Ky. 2011) (quoting Shegog v. Commonwealth, 142 S.W.3d 101, 105 (Ky. 2004) ). The Court has "further described good cause *669 as '(1) a complete breakdown of communications between counsel and defendant; (2) a conflict of interest; and (3) where the legitimate interests of the defendant are being prejudiced.' " Stinnett, 364 S.W.3d at 81 (quoting Deno v. Commonwealth, 177 S.W.3d 753, 759 (Ky. 2005) (citing Baker v. Commonwealth, 574 S.W.2d 325, 326-27 (Ky. App. 1978) ) ). Whether there is such "good cause" for substitute counsel is a matter within the discretion of the trial court. See Pillersdorf v. Department of Public Advocacy, 890 S.W.2d 616, 621 (Ky. 1994) (decided under now-repealed KRS 31.130 on "Assignment of substitute attorney"). "Accordingly, the bar is set high for a defendant to force appointed counsel off the case." Stinnett, 364 S.W.3d at 81. "[M]ere dissatisfaction with appointed counsel's performance is insufficient to support a motion to support his removal." Id.
The reasons posited by Henderson for counsel's removal are simply insufficient and unfounded from review of the record. Most of his allegations were refuted by his appointed counsel. Even Henderson's own statements were contradictory, at one point complaining that his attorney never discussed strategy and then describing conversations that were clearly about strategy. This is a high bar and there must be good cause for removal. Given all the evidence before the court after this hearing, we cannot say that the judge abused his discretion by denying the motion for substitute counsel.
Henderson also cites to his federal lawsuit as grounds for needing substitute counsel. He filed a complaint in the Western District of Kentucky. Admittedly, the filing of a lawsuit may lead to a conflict, creating a "good cause" for substitute counsel. However, "while we have recognized that a bar complaint or a lawsuit filed by an indigent defendant against his appointed counsel may give rise to good cause for his replacement, such filings do not warrant an automatic substitution of an assigned public defender." Stinnett, 364 S.W.3d at 81 (citing Grady v. Commonwealth, 325 S.W.3d 333, 345-46 (Ky. 2010) ). Allowing such an "automatic substitution" "would allow a dissatisfied client to manufacture 'good cause' by simply filing a bar complaint" or frivolous lawsuit. Stinnett, 364 S.W.3d at 81. To allow this abuse of the system "would usurp [this Court's] holding that defendants are not entitled to replace their counsel without good cause and would not serve the judicial economy of the courts of this Commonwealth." Grady, 325 S.W.3d at 346 (citing Deno, 177 S.W.3d at 759 ). Henderson's complaint was summarily dismissed by the district court in January 2016 for failure to state a claim upon which relief could be granted. There is no foundation for finding that the trial court abused its discretion in determining that this lawsuit did not provide "good cause" for dismissing Lemke and appointing new counsel.
"[S]o long as the trial court allows the defendant to state on the record the reasons why he seeks substitution of counsel, the trial court may exercise discretion to determine how extensive the hearing needs to be in light of the factual circumstances of each individual case." Grady, 325 S.W.3d at 346 ; see also Deno v. Commonwealth, 177 S.W.3d 753, 759-60 (Ky. 2005). The trial court here conducted a lengthy hearing into Henderson's allegations. He allowed Henderson ample time to discuss his reservations, complaints, and allegations regarding his attorney's conduct. The court also allowed defense counsel to respond to those complaints. Given all the evidence, statements, and conduct before the trial judge, the court did not abuse its discretion in denying Henderson's motion.
*670 C. Stand-by or Hybrid Counsel
Henderson also alleges error by the trial court misadvising him of his choices if he wanted to dismiss appointed counsel and in failing to appoint hybrid[7] or stand-by[8] counsel for him once he was permitted to represent himself. As to the first allegation, at the status hearing on October 2, 2014, Henderson reiterated his request for new counsel, "I'm still seeking new counsel. I'm not satisfied." The trial court told him he could hire any attorney he wanted. When Henderson said he was not going to trial with Mr. Lemke, the trial court stated, "You asked this Court to appoint counsel for you ... [Michael Lemke is] a very good, competent lawyer and he's your lawyer. So, you have two options. You can either go to trial with your appointed counsel or you can hire any attorney who's a member of the Kentucky Bar Association, if you choose to, to represent you. You don't get to pick and choose who your appointed counsel is." When Henderson reiterated his dissatisfaction, the trial court merely requested that he file a new motion and they would take it up at another time.
Henderson also alleges error in the trial court's failure to appoint another attorney as hybrid counsel for him at trial. When Henderson seemed amicable to the idea of stand-by counsel, the trial court explained that he could have Lemke available to assist on certain procedural issues. Henderson asked if his counsel could be someone other than Lemke. The trial court stated that was a decision left to the office of the public defender and that Lemke's "boss," Dan Goyette, decides which attorney represents which client. Henderson now claims this statement was in error and, in failing to appoint a different attorney as hybrid or stand-by counsel, the court violated his constitutional rights.
These two allegations of error become highly intertwined upon review; they both infringe upon Henderson's right to hybrid or stand-by counsel. However, that right is not absolute. A request for hybrid counsel must be "timely and unequivocal." Deno, 177 S.W.3d at 758. Henderson never requested hybrid counsel. He wanted a different attorney; when that request was repeatedly denied, without error by the court, he then decided to represent himself. He never requested stand-by counsel. At his Faretta[9] hearing, the trial court explained he could have Lemke stay on to assist Henderson in various matters, like ensuring Henderson had street clothes for the trial. Henderson did not want Lemke to stay on, even in a stand-by capacity. He asked if he could have another attorney, but the trial court informed him that the appointment of a particular attorney for him was not the court's choice.[10] Trial courts are not required to "sua sponte inform defendants of their right to hybrid representation."
*671 Mitchell v. Commonwealth, 423 S.W.3d 152, 162 (Ky. 2014). Thus, the court did not err in failing to inform Henderson of the various forms his hybrid or stand-by counsel could take, without being requested.
Additionally, Henderson was open to the idea of a stand-by attorney if it could have been someone other than Lemke; this once again returns to the idea of substitute counsel, even as a stand-by counsel. There was no good cause shown for Lemke to be removed. Thus, the trial court did not err in failing to appoint a different attorney as stand-by counsel. Even if the court was mistaken in the process, as the trial court could undoubtedly find a conflict or cause necessitating substitute counsel thus clouding his statement to Henderson with some doubt, it made no difference for Henderson's case. Lemke was his attorney; Lemke's representation could have been limited through Henderson's waiver to hybrid or stand-by counsel. However, even if Henderson decided to knowingly waive certain rights and choose one of these options, that decision does not create good cause for Lemke to be removed. There was still no error in such a decision.
Henderson also claims that the court erred in failing to sua sponte appoint stand-by counsel for Henderson after he informed the court of a sleep condition that caused him to fall asleep. Importantly, there does not appear to be any medical proof in the record of Henderson's condition. Instead, he was falling asleep during voir dire and he informed the court he had a medical condition causing him to fall asleep involuntarily. This happened again on the third day of trial and Henderson asked the court to instruct the jury on his medical condition.[11] The court did so. A trial court may appoint stand-by counsel over the objection of a defendant. Allen v. Commonwealth, 410 S.W.3d 125, 134 (Ky. 2013) (citing Chapman v. Commonwealth, 265 S.W.3d 156, 166-67 (Ky. 2007) ). However, we have never recognized a duty of a trial court to impose stand-by counsel over the defendant's objection. If a defendant is incompetent to represent himself, then he cannot represent himself, pursuant to Faretta. That is a clear duty for the trial court. However, we have never required an affirmative duty to impose upon an unwilling defendant a stand-by or hybrid counsel. Even if we did, "when a trial court appoints standby counsel over a defendant's objections, the defendant typically may define standby counsel's participation in the trial." Allen, 410 S.W.3d at 134-35 (citing Chapman, 265 S.W.3d at 169-70 ). If the court had appointed stand-by counsel, it would have been Michael Lemke, Henderson's prior attorney. Henderson did not want Lemke to have anything to do with his case. Henderson still would have been opposed to Lemke's involvement in his case, even as stand-by counsel, and Lemke would have been unable to provide assistance.
However, the issue remaining is whether the trial court's misstatement of the law is sufficient to create structural error and require reversal. "A trial court acts erroneously where it affirmatively misrepresents a defendant's choice of counsel as being between 'only two alternatives: either represent himself or accept appointed counsel." ' Nunn, 461 S.W.3d at 748 (quoting Baucom v. Commonwealth, 134 S.W.3d 591, 592 (Ky. 2004) ). "[I]t is error for the trial court to misstate that a form of hybrid representation is unavailable in response to an inquiry by a defendant *672 or his counsel." Mitchell, 423 S.W.3d at 162.
The "complete abridgment of the defendant's right to hybrid counsel" has been found to be "structural error." Nunn, 461 S.W.3d at 750 ( Deno, 177 S.W.3d at 757 ). In Mitchell, "the trial court failed to correct its misstatement of the law, thus Appellant proceeded to trial under the belief that hybrid counsel was not an option." 423 S.W.3d at 162. Such error amounted to a structural error requiring reversal. See id. However, structural error is not always present when there are errors related to a hybrid counsel arrangement. In Nunn, this Court determined that arbitrary limitations upon the defendant's arrangement with hybrid counsel was, although error, harmless as there was no prejudice. Nunn, 461 S.W.3d at 750.
Here, the trial court misstated the law: he informed Henderson he had a choice to either accept Lemke as his appointed counsel or hire another attorney. At first blush, this is clearly an error. However, we must look beyond a sole statement to understand the context. This conversation was not happening in the midst of Henderson requesting self-representation, hybrid counsel, or stand-by counsel. He simply wanted another attorney. If he wanted a licensed attorney to represent him, then he did have two options: either accept his appointed counsel (absent a showing of good cause for substitute counsel) or hire an attorney. Even if the trial court's statement was in error, there is no structural error here. Henderson's rights to hybrid counsel were not completely abridged. He ultimately determined he wanted to proceed pro se, without even stand-by counsel, and was afforded that right. He did not proceed to trial under the guise of a disillusioned belief as to his representation options. As such, this Court does not find any reversible error in the trial court's instructions to Henderson.
D. Testifying in Narrative Form
Additionally, Henderson also claims that the trial court erred by advising him that, if he chose to testify while representing himself, he would have to ask himself questions and answer rather than giving a narrative of events. Henderson now alleges that his rights were misrepresented to him and the waiver of his right to testify on his behalf was not made knowingly, voluntarily, or intelligently. The foundational error in Henderson's argument is that his argument is premised on a right to present his testimony in narrative form, rather than in a question and answer form. Kentucky law has yet to recognize such a right .
To be sure, this Court has recognized that when counsel believes his or her client is going to provide perjured testimony, the ethical rules and defendant's constitutional rights may both be protected through narrative testimony. See Brown v. Commonwealth, 226 S.W.3d 74, 84 (Ky. 2007). Even that recognition was very theoretical rather than a concrete holding. See id. However, that recognition has never, as yet, been expanded into the pro se criminal defendant arena by our courts. There is no clear consensus among the state jurisdictions;[12]
*673 in the federal courts, it is a matter of the court's discretion. See § 7:4. Can a witness testify in the narrative form instead of the customary question-and-answer form?, Robert E. Larsen, NAVIGATING THE FEDERAL TRIAL § 7:4 (2018 ed.). The decision to allow such narrative testimony arises from the court's discretion under Federal Rule of Evidence (FRE) 611(a), providing that "The court should exercise reasonable control over the mode and order of examining witnesses and presenting evidence so as to: (1) make those procedures effective for telling the truth; (2) avoid wasting time; and (3) protect witnesses from harassment or undue embarrassment."
Kentucky's corollary rule of evidence, Kentucky Rule of Evidence (KRE) 611(a) is almost identical: "The court shall exercise reasonable control over the mode and order of interrogating witnesses and presenting evidence so as to: (1) Make the interrogation and presentation effective for the ascertainment of the truth; (2) Avoid needless consumption of time; and (3) Protect witnesses from harassment or undue embarrassment." It seems, therefore, that any power granted to Kentucky trial courts to allow a defendant, acting pro se, to testify in narrative form would arise from this corollary rule. However, that does not mean that such permission is automatic; KRE 611(a) is a discretionary rule allowing the trial court to maintain "reasonable control" over the courtroom. "We review a trial court's exercise of that control for abuse of discretion." Burke v. Commonwealth, 506 S.W.3d 307, 321 (Ky. 2016) (citing Mullikan v. Commonwealth, 341 S.W.3d 99, 104 (Ky. 2011) ).
The morning of trial, the Commonwealth brought to the trial court's attention the matter of question and answer testimony vs. narrative testimony. The prosecution conceded that there was no bright-line rule and that sometimes defendants were permitted to present narrative testimony. However, it requested that the trial court require question and answer testimony, should Henderson choose to testify, to allow reasonable opportunity for the Commonwealth to object to inadmissible testimony. The judge described both procedures for testimony to Henderson; he explained that he was leaning towards the question and answer format but wanted to do some more research before making a final determination. He asked Henderson for his thoughts. Henderson asked, "So if I take the stand, I'd have to question myself?" The judge specifically told him that was just the proposal from the Commonwealth. He explained the reasoning behind such a process, to allow the Commonwealth to object and reduce the risk of inadmissible testimony being heard by the jury. Henderson asked a couple more questions and then admitted the purpose was "reasonable." The trial court simply said it would take the request under submission.
It does not appear that the issue arose again. The trial court made the traditional colloquy of Henderson as to whether he waived his right to testify. Henderson asked a clarification of the court, "I mean, well, what am I gonna get up on stand and tell my story? That would be my testimony." The trial judge did not tell him that this would be the format, nor did he say it would be the question and answer format. He just repeated, "Well, you have, all I am asking you is do you understand that you have the right to testify in front of this *674 jury?" Henderson said he understood and unequivocally stated he was waiving that right.[13] Henderson did not request a final decision on the format of his testimony before making that waiver, despite being fully informed of the options.
First, the preservation of this issue is questionable. Henderson did not even object to a question and answer format of testimony, he merely asked questions about the process. It was the Commonwealth's motion that the trial court failed to rule upon. Neither party insisted upon a ruling from the trial court. Even if we reviewed this alleged error, it would have to be under palpable error review. When such an error is unpreserved, "appropriate relief may be granted upon a determination that manifest injustice has resulted from the error." Kentucky Rule of Criminal Procedure (RCr) 10.26. No such "manifest injustice" can be found in this scenario. Henderson originally was leaning towards not testifying. The trial court informed him of both methods of presenting testimony to the jury yet did not make a final decision. Armed with all this information, Henderson made a knowing and intelligent waiver of his right to testify.
Second, even if the trial court had decided to limit Henderson to questioning himself on the stand, that would not necessarily be error. Under KRE 611(a), the court is imbued with discretion to control the courtroom atmosphere. "[T]he trial court had inherent authority to control the trial proceedings and specific authority under KRE 611 (a) to control the mode of interrogation of witnesses." Mullikan, 341 S.W.3d at 104. The court clearly had misgivings about Henderson providing inadmissible testimony should he testify in narrative format. The Commonwealth made a reasonable request for an opportunity to object to questions. The decision to allow such an opportunity would be within the court's proper discretion under KRE 611(a).
Henderson wants this Court to interpret the trial court's statements as an error in restricting the form of his testimony, which then influenced Henderson's decision not to testify, and ultimately led to the prejudice of his case. This Court is unwilling to make such a leap. The trial court made no actual decision adverse to Henderson's interests. No proof from the record demonstrates that Henderson made his decision not to testify under a mistaken assumption that he would be required to question himself. Even if he was restricted in such a manner of testimony, that decision would be well within the discretion of the trial court. As such, no reversible error occurred.
E. Suppression
Henderson filed two motions to suppress evidence: a motion to suppress his statement, arguing the statement was illegally obtained after Henderson had invoked his right to remain silent, and a motion to suppress "fruits of warrantless arrest of the defendant," arguing that officers had arrested him inside his home without a warrant. On appeal, Henderson only alleges that the first motion to suppress his statement to police was denied in error by the trial court. A hearing was held on the first motion on September 11, 2012. At the hearing, the Commonwealth presented testimony from the lead detective, Detective *675 Kim Farmer. The defense presented no evidence in response.
According to Det. Farmer's testimony, the police were called to the scene in the early morning hours. Det. Farmer arrived at approximately 4:30 a.m. that morning. Henderson had already been secured and held in the backseat of a police cruiser. She attempted to initiate questioning of Henderson, but he unequivocally invoked his right to remain silent, stating, "I ain't gonna waive my rights." Det. Farmer left him in the cruiser with another officer and joined the investigation of the scene, which continued for several hours. Officers obtained search warrants for Henderson's clothing and DNA.
At approximately 10:30 a.m., officers took Henderson inside the apartment complex to execute the search warrant for his clothing, buccal swab, as well as photographs of his person. According to Det. Farmer, Henderson began asking officers questions about the evidence being taken. She told him, in clear terms, that she was unable to discuss the case with him because he had invoked his right to remain silent; he continued to ask questions. Based on his continued questioning of officers, when Det. Farmer returned Henderson to the police cruiser, she asked him if he wanted to speak with her about what had happened. He told her yes. Henderson was transported to the Louisville Metro Police Department ("LMPD"). Det. Farmer again informed Henderson of his Miranda rights. He waived those rights and signed a written waiver. Det. Farmer interviewed Henderson for "several hours," according to her testimony.
Henderson's recorded statement with Det. Farmer was introduced through another detective, Det. Tony Gibson, with the Louisville Police Sex Crimes Unit,[14] and played for the jury. During the interview, Henderson did not admit guilt. He described a consensual encounter with Alice, the victim. Henderson calmly claimed his innocence throughout the interview. His overall statement was, for the most part, consistent with the defense he presented at trial. At Det. Farmer's insistence that Alice did not harm herself, Henderson admitted that it was only the two of them in the house. He expressed confusion at what could have occurred because he insisted he had not harmed or assaulted Alice. The most damaging portion of the interview was when Henderson vacillated as to whether he could have injured Alice, convinced by Det. Farmer's statements that something had to have happened that maybe he simply could not remember. He wondered whether he could have responded in self-defense as Det. Farmer had hypothesized.
"[W]e utilize a clear error standard of review for factual findings and a de novo standard of review for conclusions of law" in reviewing a trial court's denial of a suppression motion. Jackson v. Commonwealth, 187 S.W.3d 300, 305 (Ky. 2006). The first step entails a determination "if the facts found by the trial judge are supported by substantial evidence[.]" Commonwealth v. Pride, 302 S.W.3d 43, 49 (Ky. 2010). "[F]indings of fact are clearly erroneous only if they are manifestly against the weight of the evidence." Frances v. Frances, 266 S.W.3d 754, 756 (Ky. 2008) (citing Wells v. Wells, 412 S.W.2d 568, 571 (Ky. 1967) ). Then, an appellate court must determine if the trial judge had a "substantial basis" for finding "that *676 probable cause existed." Pride, 302 S.W.3d at 49 (quoting Illinois v. Gates, 462 U.S. 213, 236, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983) ).
The findings of fact made by the trial court were not clearly erroneous; they were clearly substantiated by Det. Farmer's testimony. As no other witnesses or evidence were presented, such findings are not manifestly against the weight of the evidence. Thus, we have the following relevant factual findings: Henderson was held in the back of a police cruiser for over 6 hours; during this time, he seemed to be relaxed and as comfortable as possible, sleeping often; he unequivocally invoked his right to remain silent at the first initiation of contact; Henderson began talking to officers while they executed search warrants on his person; after Henderson reinitiated contact, Det. Farmer asked if Henderson would be willing to talk about the investigation with her and Henderson said yes; Henderson was then interviewed by Det. Farmer for several additional hours.
"In order to use statements, whether exculpatory or inculpatory, made by a defendant subjected to custodial interrogation, the prosecution must demonstrate that the [defendant] was advised of his Fifth Amendment rights, including the right to remain silent and the right to an attorney." Cummings v. Commonwealth, 226 S.W.3d 62, 65 (Ky. 2007) (citing Miranda v. Arizona, 384 U.S. 436, 444, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966) ). The "rights may be waived and the statements may be used against the defendant if the waiver is knowing, voluntary, and intelligent." Cummings, 226 S.W.3d at 65 (citing Miranda, 384 U.S. at 444, 86 S.Ct. 1602 ). After a defendant invokes the right to an attorney, "he is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police." Cummings, 226 S.W.3d at 65 (citing Edwards v. Arizona, 451 U.S. 477, 484-85, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981) ). Additionally, "[o]nce an individual being questioned has asserted her right to remain silent, the police must end the interrogation." Buster v. Commonwealth, 364 S.W.3d 157, 163 (Ky. 2012).
Here, Henderson clearly invoked his right to remain silent after Det. Farmer first approached him. According to her testimony, she informed him of his Miranda rights and he promptly invoked those rights and refused to waive them. Rightfully, Det. Farmer cut off all questioning.
"[T]he Supreme Court has not subsequently read Miranda as establishing a bright-line rule that police may never return to questioning a suspect who has invoked his right to silence." Id. (citing Michigan v. Mosley, 423 U.S. 96, 102, 96 S.Ct. 321, 46 L.Ed.2d 313 (1975) ). Once the right to an attorney has been invoked, interrogation must cease, and law enforcement cannot re-initiate contact; it is up to a suspect invoking the right to approach law enforcement for any further questioning to constitutionally occur. See Cummings, 226 S.W.3d at 65 (citing Edwards, 451 U.S. at 484-85, 101 S.Ct. 1880 ). However, after a suspect invokes the right to remain silent, no such bright-line rule has been created. "[O]nce the right to silence was invoked, Miranda did not create a per se prohibition of indefinite duration on any further questioning." Buster, 364 S.W.3d at 163 (quoting Commonwealth v. Vanover, 689 S.W.3d 11, 12 (Ky. 1985) ). Thus, "admissibility of statements obtained after the person in custody has decided to remain silent depends under Miranda on whether his 'right to cut off questioning' was 'scrupulously honored.' "
*677 Buster, 364 S.W.3d at 164 (quoting Mosley, 423 U.S. at 104, 96 S.Ct. 321 (quoting Miranda, 384 U.S. at 474, 86 S.Ct. 1602 ) ); see also Carlisle v. Commonwealth, 316 S.W.3d 892, 896 (Ky. App. 2010) (quoting Mosley, 423 U.S. at 104, 96 S.Ct. 321 ) ("[S]tatements made after such an invocation are admissible provided the authorities have 'scrupulously honored' the defendant's right to remain silent."). The Court looks to several factors in making this determination:
(1) whether the suspect was informed of his Miranda rights before the initial interrogation; (2) whether the officer 'immediately ceased the interrogation and did not try either to resume the questioning or in any way persuade [the suspect] to reconsider his position' once the suspect invoked his right to silence; (3) the differences in the circumstances between the original and subsequent interrogation, such as whether it was about the same or different offense, the length of time between the two interrogations, whether it was conducted in a different location, and whether it was conducted by a different officer; and (4) whether the suspect was re-informed of the Miranda rights before the second interrogation.
Buster, 364 S.W.3d at 164 (quoting Mosley, 423 U.S. at 104-05, 96 S.Ct. 321 ).
Applying these factors, the totality of the circumstances supports the trial court's finding that Henderson's statements were made voluntarily, rather than being the product of any kind of coercion. Henderson was informed of his Miranda rights at the time of the initial encounter with Det. Farmer. At that point, after invocation, Det. Farmer immediately ceased questioning and left Henderson to investigate the scene, honoring the invocation of his right. The third factor weighs towards Henderson's argument; the same officer was involved with both interrogations and questioning occurred at the police cruiser on the scene. However, under the fourth factor, Henderson was taken to a different area, the LMPD, and his Miranda rights were again explained before the interrogation began. He even asked questions about those rights which Det. Farmer answered openly. He signed a waiver of rights and answered questions for the next few hours without again re-invoking any of those rights.
In Buster, the defendant invoked her right to remain silent. 364 S.W.3d at 164. Officers initially stopped questioning her and contacted the social worker involved in the case to let him know she had chosen to remain silent. Id. However, rather than leaving the defendant alone, the social worker asked the officer to try to find out if the defendant would speak with him. Id. The officer almost immediately returned to the defendant and asked if she would speak with the social worker, to which she consented. Id. The social worker then spent the next half hour with defendant, attempting to convince the defendant to speak with law enforcement. Id. "[T]hese actions constituted an attempt by [the officer] and [social worker] to try to 'persuade [defendant] to reconsider' her invocation of her right to remain silent." Id. (quoting Mosley, 423 U.S. at 105, 96 S.Ct. 321 ). While Mosley presented "two distinct interrogations with a defined break in between", the defendant in Buster "was essentially in constant contact with" the officer and social worker. Buster, 364 S.W.3d at 166. In Buster, the Court determined that the law enforcement officer's actions were all intended to convince the defendant to change her mind about invoking her constitutionally protected right to remain silent. Id. at 168.
Here, Det. Farmer did not attempt to convince Henderson to waive his rights.
*678 After he decided to remain silent, she left him alone and did not attempt further interrogation. Several hours had passed before she had any further contact with Henderson. It was only after Henderson continued to speak to officers during the execution of the search warrants that Det. Farmer asked if he would be willing to speak with her. Henderson immediately responded that he would be so willing. Rather than instantly beginning questioning, Det. Farmer had Henderson transported to LMPD and re-informed him of his rights before questioning began. Henderson had an opportunity to consider his options and his rights and still chose to waive his right to remain silent. All the circumstances support the trial court's finding that Henderson's statement was knowing, voluntary, and intelligent and, therefore, admissible.
Although Henderson attempts to convince this Court that he was coerced into making a statement, there is nothing in the record to support such a conclusion. He argues that the voluntariness of his statement was undermined by coercive tactics. To support this alleged coercion, Henderson cites to the lengthy amount of time he remained in the police cruiser at the scene and Henderson's drug use the prior evening. However, the only evidence before the trial court on this motion was Det. Farmer's testimony. While Henderson was in the police cruiser for several hours, a fact that, admittedly, seems unnecessary for proper investigation, there is nothing to support the conclusion that the lengthy delay caused any kind of undue pressure. Additionally, this delay also supports finding that, by the time interrogation started, it seemed the effects of any illicit substances had substantially worn off. From the review of the interrogation, Henderson seemed alert, coherent, and able and willing to answer any and all questions. There is nothing in this record to support a holding that Henderson's statements were coerced. As such, the trial court did not err in finding Henderson's statement to be voluntary, intelligent, and knowing. The admission of the recorded statement did not offend Henderson's constitutional rights.
F. Rape Shield Law
Henderson also claims a constitutional error in an erroneous limitation of his defense under KRE 412. During discussion on the morning of trial with the court, the Commonwealth stated that it had not received any notice under KRE 412 and thus, it would move to exclude any mention of the victim's sexual history, with Henderson or otherwise. Henderson did not object; the judge explained that Henderson could not ask Alice about any prior sexual experiences if it occurred prior to this incident. Henderson asked the court about the day of the incident, as his claim was that the alleged assault was a consensual encounter. The trial court stated that Henderson could ask questions about that day. Henderson did not object to such a ruling.
The Commonwealth called Alice as its first witness. Henderson conducted a thorough cross-examination. He questioned Alice as to: her injuries and how they occurred; her statements to investigators; inconsistencies between statements and the physical possibility of her injuries based on her narrative; her drug use; her past interactions with Henderson; potential bias causing her to lie (to maintain her relationship after a consensual encounter with Henderson); and her being under the influence of drugs the evening of the assault.
Despite the court's ruling on KRE 412, Henderson still attempted to ask Alice about past sexual encounters.
*679 H:[15] So, you said you come over to the house. I supposedly choke you out. I supposedly penetrate you with my finger. I supposedly kiss your breasts. I supposedly done all this [unintelligible ] going through all this, happened a thousand times before. So this night - what make this night any different than any other night?
A:[16] What happened a thousand times before?
H: I ask the questions.
The judge called the parties to the bench. He told the parties he interpreted that question to refer to Alice's past sexual conduct with any other person and instructed Henderson to limit his questioning to this particular event. When he resumed questioning, Henderson again asked Alice, what made that night so different from all the other times Alice had been there. Alice responded, "Are you saying we've had some kind of relationship going?" Henderson asked why he would suddenly do something like this to Alice on this evening and she responded, "I don't know what possessed you to do something like that to me."
Later, Henderson resumed his questioning about a prior relationship.
H: So me and you did not have a relationship?
A: Absolutely not.
H: I never kissed your breasts before?
A: Yes, you did that night.
H: I never ran my hands -
A: While my hands were tied behind my back. You forcefully did it.
H: Now she can make that kind of statement but I can't forcibly say that the only reason she make this is statement is because you -
CW:[17] Your Honor, can we approach?
Henderson continued to angrily speak as the parties approached the bench. The court ordered the jury to take a restroom break. Rather than being angry about being restricted from asking about a prior relationship, Henderson was angry about being unable to delve into the reasons for why Alice would be lying, including the fact that he said she feared being caught high and losing custody of her daughter. The court's instruction to Henderson at this time focused on Henderson being forced to ask questions and allow Alice to answer; the court restricted Henderson from asking about collateral matters, like Alice's experience in drug court in 2006, losing her child in 2006, and having sex with other men. After the break, Henderson asked a few more questions before ending his cross-examination.
Under KRE 412(a), "evidence offered to prove" either "that any alleged victim engaged in other sexual behavior" or "any alleged victim's sexual predisposition" is inadmissible. However, in a criminal trial, under KRE 412(b), "evidence of specific instances of sexual behavior by the alleged victim offered to prove that a person other than the accused was the source of semen, injury, or other physical evidence" and "evidence of specific instances of sexual behavior by the alleged victim with respect to the person accused of the sexual misconduct offered by the accused to prove consent or by the prosecution" are admissible, if admissible under the other rules of evidence. The rules also allow "other evidence directly pertaining to the offense charged" to be admissible. Any person intending to introduce evidence pursuant to KRE 412(b) must provide written notice at *680 least 14 days prior to trial. KRE 412(c)(1)(A). The rule also requires that the court conduct an in camera hearing prior to admitting such evidence. KRE 412(c)(2).
The preservation of this issue is questionable, at best. When the Commonwealth objected to any KRE 412 evidence being admitted, Henderson did not object. He asked for clarification as to whether he could ask about consensual acts on the day of the alleged assault and the trial court informed him he could. He did not object during questioning to this limitation. Instead, he was concerned about the restriction of questioning Alice about past collateral incidents. Henderson alleges that this "error" affected his constitutional right to present a defense. However, even constitutional errors are subject to procedural rules and waiver. See West v. Commonwealth, 780 S.W.2d 600, 602 (Ky. 1989) (citing Futrell v. Commonwealth, 437 S.W.2d 487, 488 (Ky. 1969) and Brown v. Commonwealth, 551 S.W.2d 557 (Ky. 1977) ).
Even assuming the error was preserved, such error would be nothing more than harmless. The trial court did misstate the rule under KRE 412. If Henderson was presenting a consent defense, then he was entitled to ask about prior consensual experiences between him and the victim. However, he did ask those questions. And Alice unequivocally denied any such relationship. Even if he was prevented from asking further questions by the erroneous KRE 412 statement, he would have been prevented from continuing to ask her questions to which she had already answered a clear "no." However we review this issue, Henderson asked about the prior relationship. Alice denied such a relationship. Henderson's right to present a defense was not inhibited. At most, any error here was harmless.
G. Recalling a Witness
As stated, the Commonwealth called Alice as its first witness. After direct examination, Henderson stated he was not prepared to cross-examine; he told the court he thought he could call the witness when he wanted to call the witness. The court told Henderson that she was an inmate transported from another state, so Henderson's opportunity to confront and cross her was at that time only. Henderson asked if he could not recall Alice later and the court told him, no. Henderson then asked for a recess to retrieve and review materials to prepare for Alice's cross-examination. The court took a lengthy lunch break to allow Henderson time to prepare. After returning, Henderson did object to the court's limitation on the ability to recall Alice as a witness, claiming that future witnesses could contradict her, and she should be subject to recall and impeachment.
This Court has issued a recent, albeit unpublished, case directly on point with Henderson's alleged error. In Holbrook v. Commonwealth, 2012-SC-000703-MR, 2014 WL 4160137, *5 (Ky. Aug. 21, 2014), a pro se defendant alleged reversible error in the trial court's decision to prohibit him from recalling a witness. The witness was required to be at work the next morning at 3:00 a.m., so the trial court determined it would release the witness after cross-examination. Id. Citing to Mullikan, 341 S.W.3d at 104, this Court held such a decision was within the discretion of the court. Id. The decision was "supported by sound legal principles." Id. (quoting Commonwealth v. English, 993 S.W.2d 941, 945 (Ky. 1999) ).
"[T]he trial court had inherent authority to control the trial proceedings and specific authority under KRE 611(a) to control the mode of interrogation of witnesses."
*681 Mullikan, 341 S.W.3d at 104. Alice was an out-of-state prisoner at the time of her testimony. She had been transferred from another state's institution to testify against Henderson. The court was within its discretion to determine it was unnecessary to hold her in the local jail, at the expense of taxpayers, for longer than necessary. This decision was not arbitrary. Henderson was told prior to cross-examination that Alice would not be subject to recall. The trial court also gave Henderson a lengthy break to prepare for cross-examination. Such a decision was not an abuse of discretion.
III. CONCLUSION
For the foregoing reasons, this Court affirms, in all respects, the judgment of the Jefferson Circuit Court.
All sitting. Hughes, Keller, VanMeter and Wright, JJ., concur. Venters, J., dissents by separate opinion in which Minton, C.J., and Cunningham, J., join.

In accordance with this Court's procedures, we shall address the victim using a pseudonym to protect her identity.

"In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed, which district shall have been previously ascertained by law, and to be informed of the nature and cause of the accusation; to be confronted with the witnesses against him; to have compulsory process for obtaining witnesses in his favor, and to have the Assistance of Counsel for his defence." U.S. Const. amend. VI.

"[H]e shall have a speedy public trial by an impartial jury of the vicinage[.]" Ky. Const. 11.

The Jefferson Circuit Court is located in the most populous county in Kentucky.

See Faretta v. California, 422 U.S. 806, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975).

Even on the morning of trial, Henderson told the court that he felt the court should continue the trial because he felt he had insufficient time to prepare. Had the court granted this continuance, would Henderson now claim error and a further violation of his rights? Throughout trial, he continued to insist he had insufficient time to prepare his case. Clearly, Henderson did not really want a speedy trial; he wanted a dismissal.

"A litigant with hybrid counsel status stands in the position of being co-counsel with a licensed attorney." Nunn v. Commonwealth, 461 S.W.3d 741, 748 (Ky. 2015) (citing Mitchell v. Commonwealth, 423 S.W.3d 152, 158 (Ky. 2014) ).

"Standby counsel is defined as '[a]n attorney who is appointed to be prepared to represent a pro se criminal defendant if the defendant's self-representation ends. [ ] The stand-by counsel may also provide some advice and guidance to the defendant during the self-representation.-Also termed advisory counsel. ' " Allen v. Commonwealth, 410 S.W.3d 125, 138 (Ky. 2013) (emphasis original) (quoting Black's Law Dictionary (9th ed. 2009) ).

Faretta v. California, 422 U.S. 806, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975).

Lemke was ordered to, and did, provide Henderson with courtroom attire for the trial.

Notably, from extensive review of the record, Henderson seemed alert, comprehensive, and competent during his self-representation.

See Pietrangelo v. Wilmer Cutler Pickering Hale & Dorr, LLP, 68 A.3d 697, 717 (D.C. 2013) (finding no abuse of discretion in requiring question and answer format to allow other party to have opportunity to object); People v. Reese, 421 Ill.Dec. 845, 102 N.E.3d 126, 145 (2017) ("Acting pro se, defendant offered wide-ranging testimony in narrative form on direct examination."); Garth v. State, 411 S.W.3d 366, 373 (Mo. Ct. App. 2013) ("There is no duty for a trial court to inform a defendant acting pro se that he can testify in the narrative."); State v. Tenney, 913 P.2d 750, 754 (Utah Ct. App. 1996) (referencing trial court's decision to require defendant to present testimony in question and answer format rather than narrative); State v. Joyner, 69 Wash.App. 356, 848 P.2d 769, 774 (1993) ("Although pro se defendants are often permitted to testify in narrative form to facilitate presentation of their case, it is not necessarily an abuse of discretion to require a pro se defendant to use a question-and-answer format.") (citations omitted).

Importantly, this decision was in accordance with Henderson's earlier statements at the hearing to remove Lemke as his counsel. Then, he stated he was leaning towards not testifying. The court referenced his lengthy criminal history and both Lemke and Henderson seemed to acknowledge that history (which included a prior conviction for manslaughter, second degree, from 2002) as a con of testifying, among other factors.

Notably, Henderson objected to his statement being admitted through a detective other than Det. Farmer but was overruled. This issue was not presented on appeal. According to Det. Gibson at trial, Det. Farmer was no longer with the department due to medical problems.

Henderson

Alice

Commonwealth