RENDERED: JUNE 13, 2024
TO BE PUBLISHED

# Supreme Court of Kentucky

2023-SC-0096-MR

JOHN D. ELLIS                                      APPELLANT

|  | ON APPEAL FROM SIMPSON CIRCUIT COURT |
|---|---|
| V. | HONORABLE RODNEY BURRESS, SPECIAL JUDGE |
|  | NO. 21-CR-00147 |

COMMONWEALTH OF KENTUCKY                        APPELLEE

**OPINION OF THE COURT BY JUSTICE CONLEY**

**<u>REVERSING & REMANDING</u>**

This appeal comes before the Court as a matter of right[1] from Simpson Circuit Court. The Appellant, John Ellis, was convicted by a jury of first-degree rape, second-degree burglary, and kidnapping. He was sentenced to fifty years in prison. Ellis raises only one issue: that the trial court erred when it failed to suppress his incriminating statements. He argues that these statements were made during a custodial interrogation, and he was not properly given *Miranda* warnings; that his girlfriend was an agent of the state when he made the incriminating statements to her; and that the Commonwealth illegally recorded his conversation with his girlfriend. We agree that Ellis was in custody and not properly informed of his rights according to *Miranda.* We further hold that the police failed to adhere to the acknowledged invocation of counsel by Ellis.

---

[1] Ky. Const. § 110(2)(b).

Consequently, his statements should have been suppressed but were played at trial. This error was not harmless; therefore, we reverse his convictions.

## I.     Facts

On May 5, 2021, John Ellis appeared in a hospital reporting symptoms of a stroke. He was 65 years old at the time. Ellis was the subject of a missing person report, so Detective Jonathan Johnson went to the hospital, along with Detective Jonathan Carlock. Ellis had been missing for two or three days, and his disappearance coincided with the rape of Ashley.[2] Johnson testified that he believed Ellis was "somehow involved" but denied that he was suspected as the perpetrator. Ellis was requested to meet with the officers the next day at the Kentucky State Police post regarding his being missing. Ellis agreed. The next day, Ellis, and his girlfriend of approximately forty years, Margaret, came to the station. Margaret is the sister of Ashley. Ellis was escorted to an interview room and Margaret was left in the lobby.

Prior to the interview beginning a video camera was turned on to record the entirety of the interview. Ellis was never informed the video camera was recording. Johnson can be heard talking to another officer about his intention to get a buccal swab "pretty soon." We highlight this fact now because it is arguably inconsistent with Johnson's testimony at the suppression hearing. At that hearing, Johnson denied that Ellis was a suspect in the rape case until approximately two hours into the interview, at which point he was given his

---

[2] We use pseudonyms to protect the identity of the victim and her sister. The victim will be called Ashley, and her sister will be called Margaret.

*Miranda* warnings and asked to sign a waiver form. But he also admitted that the buccal swab was useless in the missing person case, which was one of the reasons given to Ellis as to its necessity (along with excluding all close family members in the rape case) and was gathered for the purposes of the rape case. Johnson also testified that police were interested in Ellis because he was the only male close to the family whose whereabouts the night of the rape could not be confirmed. Thus, by his own testimony, Johnson clearly thought Ellis was a suspect approximately an hour and thirty minutes prior to Ellis formally being given *Miranda* warnings.[3] And, as the interview video shows, Johnson intended to get a buccal swab before the interview even began, thereby demonstrating that Ellis was a suspect all along since, as Johnson testified, the buccal swab was unnecessary for the missing person case and could only be relevant to the rape case. Thus, we make clear our understanding that Ellis was brought in as a suspect in the rape case and it was a convenient, though deceptive, stratagem to use the otherwise legitimate missing person case as the ostensible reason to request Ellis' consent to questioning. Therefore, although Ellis did voluntarily go to the KSP post for questioning, it was under false pretenses.

The interview room's exact dimensions are not known but the video shows that it is compact, only large enough for a small table and a handful of chairs. Ellis was seated on the far side of the table from the door and was

---

[3] Johnson later confirmed at trial that Ellis was a suspect prior to the interview and claimed to not recall testimony to the contrary given at the suppression hearing.

flanked on both sides by a trooper, obstructing his ability to leave if he had desired or attempted to. Johnson testified that once Ellis was in the room, he was told he was not under arrest and free to leave, but the video shows (and the trial court noted) that no such statements were ever made. When asked how he was feeling, Ellis replied that his head was "still foggy" and his responses to the officers were delayed.

In the first hour of the interview there was nothing inculpatory stated and the questioning was normal and more or less relevant to the missing persons case, although questions about his whereabouts obviously pertained to the rape case as well. It was not until the end of the first hour that Johnson began questioning Ellis about his relationship with Ashley, including whether he was attracted to her. Then the detectives left the room for approximately ten minutes. When they came back, Johnson entered into a discourse about DNA as a preface to informing Ellis that his DNA had been matched to that found on Ashley after her rape. This was not true. The detectives then became accusatory in their questioning. Johnson stated that Ellis was treating them like "dumb cops," but that he "wanted to help you." Both officers then told Ellis that physical evidence would have more weight in court than Ellis' protestations of not remembering what happened. Detective Carlock told Ellis that he wanted him to keep denying that he remembered anything so he could take the physical evidence to court and let a jury decide what would happen to him. On the other hand, Carlock said, Johnson wanted Ellis to tell his side of the story to help him. Ellis then asked to see Margaret and was refused.

4

Detectives continued questioning along this same line. Carlock accused Ellis of calling Ashley every time Margaret was out of town. Johnson then stated that camera footage placed Ellis at Ashley's home and that he was going to have to explain that. This was not true, and no such camera or video footage was admitted at trial. Johnson asked if Ellis had "planned it or did it just happen?" He asked variations of this question several times. Johnson also told Ellis that other cameras on the way to Ashley's home had recorded him. Again, this was not true. Johnson also said that the tire treads on his car matched those found at the Ashley home. This was also not true. Johnson summarized that "mounds of evidence" existed against Ellis. At this point, Ellis stated questioningly, "I need to get a lawyer?" He clarified that he was only asking a question. Johnson told him that decision was up to him but said he was ending the interview since he had requested an attorney. Carlock attempted to ask another question about Ashley, but Johnson cut him off. Carlock also specifically asked Ellis if he wanted a lawyer to which Ellis replied, "I think I do." Both officers then ended the interview. As Carlock left the room he stated, "We're gonna [sic] go get [Margaret] and get you out of here in a second."

Approximately five minutes later, Johnson brought Margaret into the interview room. Johnson told Margaret she was brought in to "keep her in the loop," and that "we're done talking to him as far as questions because he's requested an attorney," and that "we can't do anymore interviewing." Johnson then told Margaret that Ellis' bank statements and phone records placed him in Denver, Colorado. He also told her that Ellis' DNA matched the semen found

5

on Ashley; again, this was false. Johnson told her that cameras showed Ellis' car[4] going to the Ashley residence. Ellis at this point began to speak, but Johnson spoke over him, telling him their conversation "is over." Johnson also told Margaret that "this probably isn't the first girl," Ellis' DNA would probably match DNA from other victims, and that "I can't believe that [Ashley] is his only victim."

Margaret, as a reminder, is Ellis' girlfriend of forty years and Ashley's sister. As Johnson later testified at the suppression hearing, he told her all these things hoping that she would question Ellis and "elicit a response." Margaret immediately began questioning him, "John, surely you didn't?" Ellis gave a response of what he claimed to recall, which was not incriminating, but generally denying that he remembered a rape or even going to Ashley's home.

Johnson then further engaged Margaret, telling her that Ellis had handcuffs and that the rapist had tried to handcuff Ashley. Johnson stated that normal people do not carry around handcuffs and that when they go to someone else's house with handcuffs the "intent is there, wouldn't you agree?" Margaret readily assented. Johnson and Carlock testified at trial that the handcuffs were in fact never recovered. After further emotional appeals by Johnson to Margaret, she then addressed Ellis, stating, "John, I just can't even imagine why you would do that. Why'd you take my car and go to [Ashley's] in the middle of the night?" Ellis replied, "I don't remember, [Margaret]. I

---

[4] At this point in the interview, it is stated that the exact vehicle in question is Margaret's Ford Edge, and not a vehicle registered to Ellis.

remember having some drinks like I usually do. Maybe I had too much, like I usually do." Margaret asked what would happen next, and Johnson replied that the DNA would have to be verified, but reiterated it was a match, and that "he's gonna [sic] be charged."

After Johnson summarized Ellis' flight records[5] for the prior two days, Ellis stated, "I would do nothing to hurt her." Johnson addressed Margaret, "I know he says that but how does his DNA get on her?" The conversation continued along these same lines for another few minutes and Johnson then left but the video recording continued. Margaret began questioning Ellis:

> Margaret: You think you raped [Ashley]?
>
> Ellis: No, I don't . . . I don't remember doing it if I did it, [Margaret].
>
> M: And you took my car over to her house. Why did you fly to Denver? You bought a plane ticket and went to Denver.
>
> E: I don't know.
>
> M: And tried to get money in Denver. Were you trying to escape?
>
> E: I was scared, I guess.
>
> M: Scared of what? What were you scared of?
>
> E: I don't know.
>
> M: That you would get caught?
>
> E: I guess, I don't know. I was just really, really confused.
>
> M: John, you know what's going to happen?
>
> E: Go to prison, I guess.
>
> M: Yes, you are.

---

[5] He had apparently flown to Denver, Colorado and back to Nashville, Tennessee. This evidence was not admitted at trial.

E: The only reason to come back [inaudible].

M: [Inaudible]... Do you think you just got drunk, that you just went crazy and did this?

E: I think I did, [inaudible].

Discussion continued about making plans while Ellis would be in jail, at which point the conversation went,

E: It was just a bad, bad mistake.

M: It's worse than a mistake. It's my sister.

E: I understand that.

M: Did you get drunk?

E: You know I wouldn't hurt her more than anything in the world.

M: Why did you break in her house?

E: I got drunk.

M: Why did you even think of that?

E: I don't know. I have no idea.

After some more conversation,[6] Johnson came back into the room and stated, "At this point, you're not free to go." Ellis replied, "I figured I wasn't." Ellis was given his *Miranda* warnings by Johnson, and both were told that Ellis would be arrested that day. Ellis was subsequently arrested by the end of the interview.

At trial, Ellis made a motion to suppress the entirety of the interview as being a custodial interrogation and for lack of proper *Miranda* warnings. A suppression hearing was conducted. Some of the testimony from that hearing

---

[6] There were other statements made to Margaret admitted at trial, but we do not think it necessary to quote them merely to exhaust the point that Margaret put Ellis to questioning and Ellis did make incriminating statements in response.

has been detailed above and other relevant portions will be detailed further. The trial court granted in part and denied in part that motion. It held that once Ellis had mentioned a lawyer he was in custody for purposes of *Miranda* and excluded all statements made to police after that, but allowed the statements made prior to it. The trial court, however, held that Margaret was not an agent of the Commonwealth when she was brought into the interview room and allowed to converse with Ellis because there was no agreement between her and the troopers that she would help them. It also held there was no showing that Margaret was coerced or that the Commonwealth exercised such significant encouragement to her as to be responsible for her conduct. Thus, the trial court allowed the statements Ellis made to Margaret when the two were alone, but suppressed those statements made when Johnson was in the room with the couple.

After a four-day trial, Ellis was convicted as noted above and the present appeal followed. We now consider the merits.

## II.    Standard of Review

The warnings required by *Miranda v. Arizona*, 384 U.S. 436 (1966), only apply when a person is in custody. "Custodial interrogation has been defined as questioning initiated by law enforcement after a person has been taken into custody or otherwise deprived of freedom of action in any significant way." *Commonwealth v. Lucas*, 195 S.W.3d 403, 405 (Ky. 2006). "The test is whether, considering the surrounding circumstances, a reasonable person would have believed he or she was free to leave." *Id.* "The term 'interrogation' under

9

*Miranda* refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." *Wells v. Commonwealth*, 512 S.W.3d 720, 722-23 (Ky. 2017) (quoting *Rhode Island v. Innis*, 446 U.S. 291, 201 (1980)). Several factors have been identified to aid our determination: location of interview; number of officers present; the demeanor of the officers during the interview, including their tone of voice and nature of questions; the display of weapons; physical touching of the suspect; whether the suspect was handcuffed or otherwise restrained; statements made during the interview; length of interview; and whether the suspect was released or arrested after the interview. *Hernandez v. Commonwealth*, 671 S.W.3d 217, 224 (Ky. 2022).

When, as here, a motion to suppress has been filed in the trial court the issue is preserved. Our review is a mixed question of law and fact. *Lucas*, 195 S.W.3d at 405. We review the trial court's findings of fact for clear error and the application of law *de novo*. *Hernandez*, 671 S.W.3d at 223. Although the specific argument that the police failed to adhere to Ellis' invocation of counsel was not made in the appellate briefing before this Court, it was preserved in Ellis' motion before the trial court. We have held that so long as we confine our review "to the record . . . no rule of court or constitutional provision prevents it from deciding an issue not presented by the parties." *Priestly v. Priestly*, 949 S.W.2d 594, 596 (Ky. 1997) (citations omitted). Moreover, we recently clarified in *Gasaway v. Commonwealth*, that we "review issues, not arguments." 671

10

S.W.3d 298, 313 (Ky. 2023) (quoting *Brewer v. Commonwealth*, 478 S.W.3d 363, 368 n.2 (Ky. 2015)). Thus, there being no question that the issue of whether Ellis' statements should have been suppressed for violation of *Miranda* is preserved, we are well-within our authority to consider that question as applicable precedent demands.

### III. Analysis

### A. Failure to Adhere to Ellis' Invocation of Counsel

We deem it unnecessary to make a custodial analysis. The trial court never made an explicit finding of when Ellis was in custody. It did, however, make a finding that when Ellis stated, "I think I need a lawyer," that was a sufficient invocation of counsel. Since the *Miranda* right to counsel only applies in a custodial setting, *Lucas*, 195 S.W.3d at 405, the trial court implicitly found Ellis was in custody by that point in time and we accept that conclusion. The trial court erred by failing to follow the implications of recognizing an invocation of counsel.[7]

The rule of *Edwards v. Arizona* is clear that once a suspect invokes the right to counsel the interrogation must cease. 451 U.S. 477, 484 (1981). "Once the right to an attorney has been invoked, interrogation must cease, and law

---

[7] Ellis did preserve this argument in his motion before the trial court. Johnson testified at the suppression hearing that he did not believe Ellis' invocation was effective and he only acknowledged the invocation to give Ellis a chance to relax and take a break. The Commonwealth has not embraced this argument on appeal, so we decline to consider it in-depth. We note only that "[a]rtful deception is an invaluable and legitimate tool in the police officer's bag of clever investigative devices, but deception about the rights protected by *Miranda* and the legal effects of giving up those rights is not one of those tools." *Leger v. Commonwealth*, 400 S.W.3d 745, 750 (Ky. 2013).

enforcement *cannot* re-initiate contact; it is up to a suspect invoking the right to approach law enforcement for any further questioning to constitutionally occur." *Henderson v. Commonwealth*, 563 S.W.3d 651, 676 (Ky. 2018). And *Edwards v. Arizona* further held that "a valid waiver of that right [to counsel] cannot be established by showing only that he [the suspect] responded to further police-initiated custodial interrogation even if he has been advised of his rights." 451 U.S. at 484. Here, of course, Ellis was never advised of his rights until after he had made incriminating admissions. Moreover, his incriminating admissions were only made after he was subjected to a custodial interrogation conducted by Johnson without any *Miranda* warnings after his invocation of counsel had been acknowledged. As such, the Commonwealth has failed to establish that Ellis' statements were made after having been advised of his rights under *Miranda*, and that Ellis had re-initiated contact after the invocation of counsel. *Henderson*, 563 S.W.3d at 676.

The actions of Johnson in bringing Margaret into the interview room, where he then conducted a three-way conversation between himself, Margaret, and Ellis, repeatedly reviewing a litany of false evidence against Ellis (including DNA evidence) is a functional equivalent of interrogation designed to elicit an incriminating response. *Rhode Island v. Innis*, 446 U.S. 291, 300-02 (1980). This is an objective analysis that looks at both the police and the suspect. "[T]he definition of interrogation can extend only to words or actions on the part of police officers that they *should have known* were reasonably likely to elicit an incriminating response." *Id.* at 302. But "[t]he latter portion of this

12

definition focuses primarily upon the perceptions of the suspect, rather than the intent of the police." *Id.* at 301. Johnson testified that he intended to use Margaret to elicit a response from Ellis. From Ellis' perspective, we have no trouble concluding that the recital of false evidence, including DNA evidence that his semen was found on Margaret's sister, for fifteen minutes would have created immense pressure upon him to make some kind of statement to Margaret in order to explain away this purported evidence. Whether this inducement to make some statement could have also produced exculpatory statements is inconsequential, because *Innis* did not limit itself to incriminating statements only, but to all statements inculpatory or exculpatory. *Id.* at 301 n.5. As *Innis* concluded, it must "be established that a suspect's incriminating response was the product of words or actions on the part of the police that they should have known were reasonably likely to elicit an incriminating response." *Id.* at 303. There is no reasonable construction of events that could lead to a conclusion other than Ellis' statements were the product of Johnson bringing Margaret into the interview room and subjecting her and Ellis to a fifteen-minute three-way colloquy specifically meant to elicit an incriminating response, by positing Ellis' guilt through the presentation of false evidence and the suggestion that Ellis was a serial rapist. Therefore, Ellis did not re-initiate contact after his invocation and the subsequent interrogation that occurred after said invocation violated Ellis' rights. *Bradley*, 327 S.W.3d at 518. Nor do we believe any of the statements Ellis made can be used to justify a conclusion that he waived his right to counsel. *Id.* at 519.

The best argument against our ruling—indeed, the only one—is that Margaret is a private person and Ellis made his statements to her when the two were alone. But we do not believe Margaret's status as a private individual alone justifies admission of Ellis' statements in this context. The test is whether Ellis' statements were the product of the police's words or actions they should have known were reasonably likely to lead to an incriminating response. *Innis*, 446 U.S. at 303. Margaret was brought into the interview room by Johnson to create the appearance of a non-custodial environment that was in fact custodial to a reasonable person under the totality of circumstances; and she was meant to create an appearance of non-interrogation when she was in fact unwittingly made a part of the interrogation both from Johnson's expressed testimony that he wanted to use her to elicit a response from Ellis, and Ellis' own objective perspective that all the purported evidence against him tending to show beyond any doubt that he had raped Margaret's sister would call for some explanation to Margaret. Margaret's status as a private individual does not, by itself, negate the fact that Ellis was in custody, nor does it negate the fact that Johnson should have known his specific conduct in this case was reasonably likely to elicit an incriminating response.

## B. No Harmless Error

Violation of a constitutional right does not, however, necessarily result in the reversal of a conviction if we find the error to be harmless beyond a reasonable doubt. *Chapman v. California*, 386 U.S. 18, 24 (1967). In *Staples v. Commonwealth*, we explained this analysis as follows:

14

> Harmless error analysis applied to a constitutional error, such as the Confrontation Clause violation addressed in *Crawford,* involves considering the improper evidence in the context of the entire trial and asking whether there is a "reasonable possibility that the evidence complained of might have contributed to the conviction." *Talbott v. Commonwealth,* 968 S.W.2d 76, 84 (Ky.1998) (quoting from *Chapman v. California,* 386 U.S. 18, 23, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967)). A properly preserved constitutional error is reversible, in other words, unless it was "harmless beyond a reasonable doubt." *Id.* (citing *Chapman*). The question is not simply whether there was sufficient evidence to support the conviction aside from the improper evidence. The question, rather, is whether the improper evidence was of a weight, was of a striking enough nature, or played a prominent enough role in the Commonwealth's case to raise a reasonable possibility that it contributed to the conviction.

454 S.W.3d 803, 826-27 (Ky. 2014).

While *Staples* involved a Confrontation clause issue, we have applied this test to *Miranda* violations. *See Quarles v. Commonwealth,* No. 2016-SC-000684-MR, 2017 WL 6379446, at *3 (Ky. Dec. 14, 2017) (holding that statements obtained following invocation of counsel in violation of *Miranda* were harmless beyond a reasonable doubt). The erroneous admission of incriminating statements may, thus, be harmless beyond a reasonable doubt. *Chapman*, 386 U.S. at 24.

If so, the convictions of Ellis can be affirmed. But the summary of evidence at trial, based upon the opening and closing statements, inexorably leads to the conclusion that the Commonwealth's case against Ellis was largely circumstantial and it was Ellis' statements which were the centerpiece of its case. No DNA evidence linking Ellis to the crime was presented at trial. No tire track evidence matching Margaret's Ford Edge was presented. No records

15

about Ellis' flight to Colorado; his bank statements; or his phone location records was admitted.[8] No video or camera evidence placing the Ford Edge or Ellis himself at the Ashley home that night was shown. The Commonwealth made Ellis' statements the focal point of its closing argument by referring to it first and foremost in its summation of evidence. The Commonwealth told the jury that Ellis' statements "seals this case," and re-played them for the jury. In its concluding remarks, the Commonwealth told the jury, "You heard from John Ellis' mouth that he committed this crime." Finally, the jury requested and was allowed to view some of the video statements again during its deliberation. The admission of the incriminating statements made to Margaret was not harmless.

With respect to the dissent, the Supreme Court of the United States has set the standard for harmless error when a constitutional right is violated: "whether there is a reasonable possibility that the evidence complained of might have contributed to the conviction." *Chapman*, 386 U.S. at 23 (quoting *Fahy v. State of Connecticut*, 375 U.S. 85, 86-87 (1963)). Importantly, that test has *always* been understood as substantively different from the state-level harmless error test for non-constitutional errors when "upon a consideration of the whole case . . . there is a substantial possibility that the result would [not]

---

[8] From our review of the record, the trial court prohibited this evidence through a motion *in limine* because the documents demonstrating it were never provided to the defense prior to trial. The Commonwealth conceded that was true. We presume this prohibition was adhered to at trial but even if it was not, that would not alter our conclusion that the admission of the statements was not harmless beyond a reasonable doubt.

16

have been any different, the irregularity will be held nonprejudicial." *Brewer v. Commonwealth*, 206 S.W.3d 313, 324 (Ky. 2006) (cleaned up). The test is familiar to bench and bar and a plethora of cases could be cited, but need not be, showing that it only applies to non-constitutional errors. *Fahy* explicitly rejected that approach when it said "[w]e are not concerned here with whether there was sufficient evidence on which the petitioner could have been convicted without the evidence complained of." *Fahy*, 375 U.S. at 86. Nothing in *Chapman* can be found to the contrary. And in fact, the Supreme Court, when considering erroneous admissions of confessions, has twice-repeated its belief that the federal harmless error test is a much more stringent test than a state-level harmless error test.

> But where, as here, an involuntary confession constitutes a part of the evidence before the jury and a general verdict is returned, no one can say what credit and weight the jury gave to the confession. And in these circumstances this Court has uniformly held that even though there may have been sufficient evidence, apart from the coerced confession, to support a judgment of conviction, the admission in evidence, over objection, of the coerced confession vitiates the judgment because it violates the Due Process Clause of the Fourteenth Amendment.

*Payne v. Arkansas*, 356 U.S. 560, 568 (1958). The Supreme Court would later make it inarguable that it believed *Payne* to specifically reject the proposition that a conviction could be sustained but for the erroneously admitted confession if the rest of the evidence would be sufficient unto itself to sustain the conviction. That proposition, which is the one the dissent indulges,

> the Court rejected in *Payne* [and] is not the harmless-error analysis later adopted in *Chapman,* but a much more lenient rule which would allow affirmance of a conviction if the evidence other

17

than the involuntary confession was sufficient to sustain the verdict. . . Such a test would, of course—unlike the harmless-error test—make the admission of an involuntary confession virtually risk-free for the State.

*Arizona v. Fulminante*, 499 U.S. 279, 309 (1991).

Combine this with the fact that prejudice is presumed in constitutional errors, *Chapman*, 386 U.S. at 24, and it is clear from that this record that the erroneously admitted admissions of Ellis did contribute to his conviction. We concede Ellis' statements were not a confession *per* se and have referred to them as "admissions" throughout this opinion. Nonetheless, they were highly incriminating admissions that were as close to a confession as one could come without confessing. That distinction, however, is largely irrelevant because the dissent agrees a constitutional error has occurred and the harmless beyond reasonable doubt applies. Although we cannot know what went on inside the jury room, much less inside the minds of the jurors, we know for a fact that the jury requested to review some of his statements during deliberation and were allowed to do so. That is the best evidence for contributing to the conviction as a reviewing court will ever get. Applying the constitutional harmless error test correctly leads to the conclusion that Ellis' convictions must be reversed.

### IV.    Conclusion

John Ellis was in custody and remained in custody approximately an hour after his interview began. Johnson acknowledged openly and repeatedly that Ellis had invoked his right to counsel under *Miranda*. Johnson was therefore bound to adhere to the procedures mandated by the Supreme Court

18

of the United States and this Court when a suspect has invoked counsel; to wit, cease the interrogation until an attorney is present or Ellis re-initiated contact. Johnson's actions in bringing Margaret into the interview room and immediately extensively and repeatedly telling her false information ostensibly proving Ellis was her sister's rapist failed to abide by that procedure and was in fact a new interrogation. Johnson intended to elicit a criminal response with this tactic, and he should have known, objectively, that such a tactic was likely to lead to an incriminating statement. Thus, the statements made by Ellis to Margaret should have been suppressed by the trial court and it erred in failing so to do. Given the circumstantial nature of the case against Ellis and the paucity of any physical proof presented at trial, we cannot say the admission of these statements was harmless beyond a reasonable doubt. Thus, we reverse his convictions and remand to the Simpson Circuit Court for further proceedings consistent with this opinion.

VanMeter, C.J.; Bisig, Conley, Keller, Lambert, and Nickell, JJ., sitting. VanMeter, C.J.; Lambert, and Nickell, JJ., concur. Keller, J., concurs in part and dissents in part by separate opinion in which Bisig, J., joins. Thompson, J., not sitting.

KELLER, J., CONCURRING IN PART AND DISSENTING IN PART: Respectfully, I concur in part and dissent in part. I concur with the Majority's holding that all of Ellis's statements made subsequent to his invocation of his right to counsel should have been suppressed. His "right to cut off questioning"

19

was not "scrupulously honored." *Michigan v. Mosley*, 423 U.S. 96, 104 (1975). Therefore, those statements were inadmissible.

However, the erroneous admission of statements admitted in violation of *Miranda v. Arizona*, 384 U.S. 436 (1966), does not result in an automatic reversal of Ellis's convictions. If the admission of those statements was harmless beyond a reasonable doubt, Ellis's convictions will stand. *See Ordway v. Commonwealth*, 391 S.W. 3d 762, 772 (Ky. 2013). In other words, we will only reverse Ellis's convictions if "in the context of the entire trial . . . the improper evidence was of a weight, was of a striking enough nature, or played a prominent enough role in the Commonwealth's case to raise a reasonable possibility that it contributed to the conviction." *Staples v. Commonwealth*, 454 S.W.3d 803, 826–27 (Ky. 2014). I do not believe that Ellis's erroneously admitted statements made to Margaret rise to this level, and, therefore, I dissent from the Majority's reversal of Ellis's convictions.

Ellis's trial spanned four days during which he was zealously represented by competent and capable counsel who subjected the Commonwealth's witnesses to vigorous cross-examination and presented compelling expert testimony. However, significant circumstantial evidence of Ellis's guilt, as is detailed below, was admitted so that the erroneous admission of his statements was harmless beyond a reasonable doubt. In short, the jury heard evidence from which they could infer that Ellis had made a copy of the front door key to Ashley's house. They heard evidence that Ellis often touched Ashley in a way that made her feel uncomfortable and said things to her that were

20

inappropriate. They saw evidence that Ellis had an injury to his face consistent with the injury Ashley's assailant likely would have sustained from her kick. They heard that Ellis had handcuffs in his garage which disappeared when he fled to Texas after the rape. Finally, they heard evidence Ellis had confessed to committing the crime, and this confession included several details that anyone unfamiliar with the crime would be very unlikely to know. Given all of this, I simply cannot conclude that there is "a reasonable possibility [Ellis's erroneously admitted statements to Margaret] contributed to the conviction." *Id.* What follows is a thorough review of the evidence admitted at trial.

Ashley, the victim in this case, was 80 years old when she was raped in her own home. According to her testimony at trial, an unidentifiable assailant entered the room in which she was sleeping at approximately 2:00 a.m. She awoke to a noise and turned over in the bed to see a man, dressed in all black with a face covering, coming into her room quickly. The room was very dark, with the only light coming from a streetlight outside of a window. The man walked around her bed, grabbed her arms, and attempted to place handcuffs on her wrists. She fought against the handcuffs, receiving injuries to the lower parts of her arms in the process, until the handcuffs fell, and the man abandoned his attempts to handcuff her.

The man then began holding her down while she continued to fight back. She grabbed at his face and felt that he was wearing glasses. As the jury would observe, Ellis also wore glasses. The man started to take off her pajama pants, and she kicked him as hard as she could in the side of the face. The man

21

eventually got her pants and underwear off and pushed her legs up over her head while holding down her arms. He attempted to insert his penis into her vagina, but she informed him that she had a pessary.[9] At that point, the man inserted his hand into her vagina, removed the pessary, and threw it. Ashley later testified that Margaret, Ashley's sister and Ellis's long-time girlfriend, also had a pessary at around the same time she did. According to Ashley, Margaret experienced some pain with the pessary, and Ellis tried to help her remove it. Eventually, Margaret had it removed by a medical professional. This testimony would have allowed the jury to infer that Ellis had at least some familiarity with pessaries, as the assailant seemingly did as well.

After removing Ashley's pessary, the man again attempted to insert his penis into her vagina, but he was unsuccessful at first, because he did not have an erection. He eventually obtained an erection and penetrated Ashley's vagina with his penis while pushing her against her headboard and holding her legs above her head.

Ashley believed the man ejaculated and may have worn a condom, although she admitted that she did not know when or how he would have put the condom on and, in fact, had never had sexual intercourse with a condom before in her life. She further explained that the rape was very painful, and she believed the man's penis was large. She conceded, however, that she had not

---

[9] A pessary is a removable device that is inserted into a woman's vagina to support her pelvic organs and help manage the symptoms of pelvic organ prolapse or stress incontinence. Pessaries are usually made of soft silicone. *Pessary*, CLEVELAND CLINIC, https://my.clevelandclinic.org/health/treatments/16036-pessaries (last reviewed Dec. 26, 2003).

had sexual intercourse for over forty years, since 1978, when her husband passed away from cancer at the age of 37.

Ashley further testified that her assailant never spoke to her. She testified that she believed he did this because he was afraid that she would recognize his voice. Instead of speaking, when the man wanted her to be quiet, he waived his finger in front of his face. Ashley explained that this was a hand motion Ellis had made to her multiple times in the past. Ashley also testified that she smelled a distinct scent when her assailant was near her. It was a scent that was "odd" and with which she was not familiar. She had known Ellis for over 40 years and had a significant relationship with him, and yet she had never smelled the scent before. Ashley denied that the scent smelled like alcohol or body odor or anything else that she recognized.

After the rape was completed, the man rubbed Ashley's chest before picking up her cell phone and leaving the room. Ashley remained quiet and still in her room for several minutes before running into another bedroom to put on another pair of pajama pants. She believed her assailant had taken her cell phone, so she was not able to call for help herself. She waited in the other bedroom for a little while longer before finally running outside. She hid behind shrubbery and then ran to a neighbor's house.

She banged on the neighbor's door, yelling for help. The neighbor answered, let her into his house, and called 911. The neighbor testified at trial that he saw blood and other injuries on her arms. He further stated that when Ashley arrived at his house, she appeared very scared and very distraught.

23

Ashley was taken by ambulance to the hospital. At the hospital, she underwent an examination by a sexual assault nurse examiner who noted injuries to her vaginal area. Many of Ashley's family members came to the hospital to support her and check on her. However, Ellis did not. Ashley testified that she thought this was very usual, as she would have expected him to be one of the first people there. She testified that she thought he cared about her. She believed he was a friend and viewed him as a brother-in-law, so his absence was notable.

Ashley was interviewed by Detective Carlock while at the hospital. She told Detective Carlock that she did not know who had raped her. She admitted at trial that she could not identify even what race or ethnicity the person was and only described him as a "big" man. Ashley also told Detective Carlock that she has a routine every night during which she watches a certain television show and then locks all of the doors to her house. She was adamant that she was certain the doors were all locked that night.

After interviewing Ashley, Detective Carlock, joined by Detective Johnson, went to Ashley's home. Simpson County Sheriff's deputies were already there and had cleared the scene. Detectives Carlock and Johnson first walked around the outside of Ashley's home. They noticed tire tracks in the mud next to Ashley's driveway and unsuccessfully attempted to get impressions of those tracks. Detective Johnson testified that he also noticed Ashley's garage door was slightly open but not enough that a person could have slid under it in order to gain access to the home. The detectives both

testified that the front door was ajar when they arrived and that some of the other access doors to the house may have been unlocked. They attributed this, however, to the actions the Sheriff's deputies had taken when they cleared the house.

Both detectives testified that they saw no signs of forced entry to the home. Detective Carlock testified that he first thought, despite Ashley's protestations otherwise, that Ashley had just forgotten to lock one of her doors. Ashley, however, stated, in no uncertain terms, that she "always" locked her doors. She further explained that her basement doors included a slide-type lock that could not be opened with a key.

Both detectives further testified that Ashley's home was very clean and well maintained. They testified that the room in which the rape occurred was obvious to them because it was the only room where things seemed out of place. They testified that the bed sheets and comforter were thrown partly off the bed, clothes were on the floor, and there was blood on the bedding. In that room, the detectives recovered Ashley's pessary, but they did not recover handcuffs. They further testified that one dresser drawer was slightly open in a second bedroom, which was the room in which Ashley went to get another pair of pants before running to the neighbor's house. Additionally, Detective Carlock testified that in the bathroom, the toilet seat was up, and there was urine in the toilet. He testified that there was a hair and some urine on the rim of the toilet. He explained that these findings made it clear to him that a man had

been in the house. He collected the hair, but it was never sent to the lab for forensic testing.

While inside of Ashley's home, detectives found her phone sitting on a chair near the front door. After Ashley and some members of her family had an opportunity to return to the home and look around, they all reported that nothing was taken or missing. Detective Carlock testified that he eventually came to believe that Ashley had, in fact, locked all of her doors and that perhaps a key had been used to gain entry. Detective Carlock also noted during his testimony that Ashley lived in a nice neighborhood that was not on a main road, and thus was not especially easy to find. Given all of these circumstances, police believed that Ashley's assailant was someone that she knew.

Despite speaking to multiple family members, detectives were unable to identify any obvious suspect. A man who had done some work at Ashley's house was mentioned, but he was quickly eliminated as a suspect. Ashley's house backed up to a golf course at a country club. Police obtained surveillance video from the country club that showed what they believed to be car headlights in Ashley's driveway during the time of the rape. The video showed headlights in Ashley's driveway at 2:22 a.m. and again at 2:56 a.m., presumably showing the perpetrator arriving and leaving Ashley's home. Neither the make and model of the car nor any occupant of the car can be determined from the video.

Detectives also collected Ring camera video from a house in Ashley's neighborhood. This video captured what appeared to be a small, light-colored SUV driving by at 12:57 a.m. Margaret drove a small, light-colored SUV, and police suspected this may have been Ellis driving to Ashley's house. Detectives, however, admitted that this would not have fit well into the timeline of the rape, given the video from the country club.

Two days after the rape, Margaret returned home from a work trip and found that Ellis was not at home, and his car was gone. She became worried about him and filed a missing persons report. Although she did not know it at the time, Margaret testified that detectives eventually told her Ellis had gone to Texas after the rape. From this evidence, the jury could have inferred that Ellis attempted to flee after committing the rape. As this Court has said numerous times over the last century, "flight is always some evidence of a sense of guilt." *Hord v. Commonwealth,* 227 Ky. 439, 442, 13 S.W.2d 244, 246 (1928); *see also, e.g., Hamblin v. Commonwealth,* 500 S.W.2d 73, 74 (Ky. 1973); *Chumbler v. Commonwealth,* 905 S.W.2d 488, 496 (Ky. 1995); *Rodriguez v. Commonwealth,* 107 S.W.3d 215, 218 (Ky. 2003).

The missing persons report was assigned to Detective Johnson to investigate. Both Detectives Johnson and Carlock immediately came to suspect that the rape and the missing persons report were related, although Detective Johnson testified that he was first concerned that Ellis was somehow another victim. A few hours after Margaret spoke to Detective Johnson regarding the missing persons report, Ellis arrived at his sister's house. He seemed

27

disoriented, and Margaret worried he had suffered a stroke. She brought him to the hospital, where Detective Johnson again met her.

Detective Johnson testified that, based on his observations of Ellis at the hospital, he began to suspect that Ellis's "medical conditions were not as serious as he was portraying them to be." He testified that he did not understand why Ellis was acting the way that he was but that it "did not add up" to him. Detective Carlock also testified that Ellis appeared to have swelling on his cheek, consistent with being kicked on that side of his face. Detective Johnson asked Margaret to bring Ellis to the Kentucky State Police (KSP) post the following day for an interview. Ellis was released from the hospital that night, and Margaret testified that doctors could not determine whether Ellis had actually suffered a stroke.

The following day, Margaret brought Ellis to the KSP post for a formal interview. Many of the details of this interview/interrogation are described in the Majority's opinion. Although Detective Carlock was the lead investigator on the rape case, Detective Johnson took the lead in the interrogation. Detective Johnson had been a detective for longer than Detective Carlock and had more experience with interrogations. Additionally, Detective Johnson had very recently completed training on the Reid technique of interrogations, and Detective Carlock had not yet had this training at the time of Ellis's interrogation.

The Reid technique is one of the most widely used police interrogation techniques in the country. When using this technique, police officers attempt

28

to minimize the suspect's offense and make the suspect feel comfortable, often by using deceit, in order to induce a confession. Detective Johnson testified that during his interrogation of Ellis, he used some of the strategies that are part of the Reid Technique but denied using it in its entirety, explaining that he believed following any specific technique step by step makes the interview feel forced and fake.

As explained by the Majority, Ellis made some incriminating statements to Margaret while being recorded at the KSP post. However, Ellis presented testimony at trial from an expert in false confessions that these statements were mere "partial admissions" and did not amount to a "confession." Ellis's expert, Professor Alan Hirsch, testified that a true confession has two parts: an admission and a narrative. The admission is the "I did it" portion of the confession. The narrative includes details about who, what, where, when, and how the perpetrator committed the offense. Those details can then be tested against the evidence to determine if the confession is a true one. According to Professor Hirsch's testimony, at best, Ellis's statements were merely admissions, as they did not include any narrative portion of a confession.

Professor Hirsch further testified about three general categories of false confessions. One of those categories is the internalized false confession, in which the innocent suspect, under interrogative pressure, actually comes to believe that he committed or may have committed the crime. Professor Hirsch explained that internalized false confessions follow a predictable pattern. They begin with a suspect who distrusts his memory for some reason, for example

29

because of alcohol use. Police then tell the suspect that they have objective and indisputable evidence that he committed the crime. This results in a suspect who is confused because he is being told the police know he is guilty, but he does not remember committing the crime, however, he also does not trust his memory. The suspect then makes tentative admissions of guilt such as "I may have done it" or "I must have done it."

Professor Hirsch testified that Ellis's admissions to Margaret fit squarely within the pattern of an internalized false confession. He explained that Ellis appeared to distrust his memory due to alcohol use. The police presented Ellis with a plethora of untruthful but supposedly conclusive and objective proof that he raped Ashley. Eventually, Ellis made admissions that he thought he did it or that he must have done it, although he was unable to provide a narrative and seemed completely clueless about the details of the incident. Professor Hirsch was clear in his testimony, however, that he could not offer an opinion about the actual truth or falsity of Ellis's confession, leaving that decision to the jury.

Relatedly, Professor Hirsch testified that detectives "aggressively" used the Reid technique on Ellis. He conceded that the Reid technique has some safeguards in place to prevent false confessions but opined that these safeguards are not nearly enough. He further testified that one such safeguard was completely ignored by detectives in their interrogation of Ellis. He explained, and Detective Johnson acknowledged, that training on the Reid technique specifically admonishes police not to tell a suspect that if he or she

30

does not remember committing the offense that does not mean that it did not happen. In this case, the detectives blatantly ignored that admonishment and said just that thing to Ellis. Professor Hirsch explained that this admonishment exists in the Reid technique training specifically to try to avoid an internalized false confession.

Ashley testified at trial that it was not until after she was told of Ellis's "confession" that she began to suspect he was her assailant. It was then that she came to recognize the finger gesture her assailant made as one that Ellis had made to her. She also described some of Ellis's behaviors over the previous years that made her feel uncomfortable. She explained that Ellis would often hug her or rub her back or leg, and that he acted this way towards other women as well, including another one of her sisters who had dementia. She further explained that it escalated to the point that she did not want to be with Ellis alone. Ashley described in greater detail two specific instances in which Ellis acted towards her in a way that she felt was inappropriate.

The first incident Ashley described occurred about a year before the rape. Ashley went to the home Ellis and Margaret shared. Ellis was in the garage, and he and Ashley spoke. At one point, Ellis got behind Ashley and hugged her. Ashley stated that she could feel Ellis pushing his body up against her. She walked away and inside of the house. Ellis also went into the house, and he acted strange and nervous.

The second incident Ashley described occurred at her house. Ellis and Ashley were standing in the hallway, near a bedroom. Ellis put his arm around

31

Ashley and said, "That's what we need," indicating towards the bed in the bedroom. Ashley explained that she never told Margaret about these incidents because she did not want to hurt her sister's feelings.

Finally, Ashley testified that whenever Margaret would go out of town for work, Ellis would call her and ask to see her. She always denied his request. She testified that the day of the rape was no different. Ellis called her, telling her that he had strawberries he wanted to give to her. As she often did, Ashley made up an excuse to avoid seeing Ellis alone and while Margaret was out of town.

At trial, the Commonwealth introduced other pieces of circumstantial evidence that Ellis had the means and opportunity to commit the crime. Ashley's grandson testified that he had installed a new front door at Ashley's house the December preceding the rape. He testified that many immediate family members had a key to the front door, and that he made approximately 7 or 8 copies of the key. Ashley testified that Margaret did not have a key to her front door.

Ashley's grandson further testified that the new front door key came attached to a small key ring. He could not get the key off of this small key ring, so he placed the small key ring, with the front door key on it, on Ashley's larger key ring. He further testified that at some point prior to the rape, the front door key ended up directly on the larger key ring.

Ashley testified that about a month before the rape, she had some car trouble. She brought her car to Ellis, who took it to a local auto parts store. He

was gone with her car, and her keys, including her front door key, for thirty or forty-five minutes. The next time she went to work, she could not find the key to her place of employment. About a week later, she went back to Margaret and Ellis's home for Ellis to do more work on her car. When he finished working on her car, he told her that he had found her work key under the seat. Ashley testified that she was surprised by this because she had looked everywhere for that key. She further testified that she later looked in the backseat and found the smaller key ring on the floor. The Commonwealth used all of this testimony about the key and key ring to argue that Ellis made a copy of the key to Ashley's front door when he went to the auto parts store and used that key to access her house on the night of the rape. The jury could have reasonably inferred from this evidence that Ellis did, in fact, make a copy of Ashley's house key and used it to gain entry to the house on the night of the rape.

Margaret's daughter also testified at trial. She testified that during the December preceding the rape, she was at Margaret and Ellis's home. She saw handcuffs in Ellis's garage and asked Ellis about them. She testified that she did not touch the handcuffs, so she could not say for sure whether they were real or fake, but that they looked shiny, as if they were metal. She further testified that she was again at Margaret and Ellis's home on the day that Margaret reported Ellis missing (two days after the rape) and did not see the handcuffs at the house on that day.

Finally, the Commonwealth presented the testimony of Ronnie Allen who was incarcerated with Ellis for a short period of time. He testified that Ellis first

33

told him that he was incarcerated for vehicular homicide but eventually admitted to raping Ashley. Allen testified that Ellis told him that he was drinking with his friends on the night of the rape and went to his wife's sister's house to work on her car with one of those friends. He said that Ellis told him that he had previously made a key to his wife's sister's house because he had done a lot of work for her. According to Allen, Ellis said that he initially inserted his fingers into his wife's sister's vagina and that something came out. He then had sex with her. Ellis told Allen that he was intoxicated at the time he raped her and did not remember all of it.

Allen admitted that he is a convicted felon and that he had been convicted of multiple crimes of dishonesty. However, he insisted that he was describing statements Ellis made directly to him and that he did not read Ellis's discovery material in order to obtain the information.

The defense sought to discredit or downplay the importance of much of the Commonwealth's evidence. Ellis especially emphasized the lack of any direct evidence linking him to the crime. He pointed out that, although the police sent some items to the KSP laboratory, they did not send everything. He further stressed that none of the items sent to the lab had DNA on them that matched his DNA. Ellis elicited testimony from both Ashley and Detective Carlock that Ashley had received sexually explicit text messages on her phone and that Detective Carlock failed to investigate the source of those messages. He also pointed out that Detectives Carlock and Johnson took photos of the crime scene but somehow lost those photos.

34

Margaret also testified at trial. Although she was called as the Commonwealth's witness, her belief in Ellis's innocence was clear from her testimony. She testified that Ellis is impotent and that the two had not had sexual intercourse in approximately four years. She testified that Ellis and Ashley had a good relationship, and that Ellis would always help Ashley when Ashley needed something. She testified that it was "not in [Ellis's] nature to do something like this." Margaret also attempted to explain the apparent injury on Ellis's face. She testified that about a year before the rape, Ellis had a cancerous spot removed from the skin near his temple. This procedure, she explained, had left a visible scar and made his eye droop.

Ellis did not testify at trial, as was his constitutional right. And although the burden of proof is squarely and solely on the Commonwealth, the jury was not presented with any alternative version of events that would have made logical sense. Instead, they heard evidence from which they could have inferred that Ellis had made a copy of the front door key to Ashley's house. They heard evidence that Ellis often touched Ashley in a way that made her feel uncomfortable and said things to her that were inappropriate. They saw evidence that Ellis had an injury to his face consistent with the injury Ashley's assailant likely would have sustained from her kick. They heard that Ellis had handcuffs in his garage which disappeared when he fled to Texas after the rape. Finally, they heard evidence from Ellis's former cellmate that Ellis had confessed to committing the crime. This confession included details about working on Ashley's car, making a copy of the front door key, and removing

35

Ashley's pessary that anyone unfamiliar with the crime would have been very unlikely to know.

Today, we must determine whether "in the context of the entire trial . . . the improper evidence was of a weight, was of a striking enough nature, or played a prominent enough role in the Commonwealth's case to raise a reasonable possibility that it contributed to the conviction." *Staples*, 454 S.W.3d at 826–27. There is no doubt that Ellis's statements to Margaret were damning evidence; however, the impact of these statements was mitigated, at least to some degree, by the testimony of Ellis's expert. Further, evidence of Ellis's explicit confession to a cellmate was admitted into evidence, and the remaining circumstantial evidence of Ellis's guilt was great. I conclude that the evidence of Ellis's statements to Margaret was not so weighty, was not so striking, and did not play a large enough role in the Commonwealth's case to require reversal of his convictions, as there is no reasonable possibility the erroneous admission of these statements contributed to Ellis's conviction. *See id.* Therefore, the erroneous admission of these statements was harmless beyond a reasonable doubt. Accordingly, I dissent in part from the Majority's opinion and would affirm all of Ellis's convictions.

Bisig, J., joins.

COUNSEL FOR APPELLANT:

Matthew J. Baker
Baker Law Office

COUNSEL FOR APPELLEE:

Russell M. Coleman
Attorney General

Courtney J. Hightower
Assistant Attorney General